138

381 A.2d 1263

In the Matter of Involuntary Termination of Parental Rights to T. M. S. and D. R. S.

Appeal of H. S. and R. S.

Supreme Court of Pennsylvania.

Submitted Sept. 20, 1976.

Decided Dec. 24, 1977.

James M. Gdula, Johnstown, for appellant.

Francis J. Leahey, Jr., Ebensburg, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and PACKEL, JJ.

140

ORDER

PER CURIAM.

NIX, J., joined by MANDERINO and PACKEL, JJ., would reverse the decree of the lower court and dismiss the petition as to the involuntary termination of the parental rights of H. S.

POMEROY, J., concurs in the reversal of the lower court's decree terminating the parental rights of H. S. under Section 311(1) of the Adoption Act, but would remand the cause to the lower court for a determination as to whether grounds exist for involuntary termination of H. S.'s parental rights under the incapacity provisions of Section 311(2) of the Adoption Act. Act of July 24, 1970, P.L. 620, No. 208, art. III, § 311(2), 1 P.S. § 311(2) (Supp.1977–78).

ROBERTS, J., joined by EAGEN, C. J., and O'BRIEN, J., would affirm the lower court's decree terminating the parental rights of H. S.

ROBERTS, J., joined by EAGEN, C. J., and O'BRIEN, J., would affirm the lower court's decree terminating the parental rights of R. S.

POMEROY, J., in a separate opinion, would also affirm the lower court's decree terminating the parental rights of R. S.

NIX, J., joined by MANDERINO and PACKEL, JJ., would reverse the decree of the lower court and dismiss the petition as to the involuntary termination of the parental rights of R. S.

Each party to bear own costs.

OPINION AFFIRMING TERMINATION [1]

ROBERTS, Justice.

In urging reversal of the decree of the orphans' court terminating parental rights under section 311(1) of the Adoption Act of 1970, the Opinion of Mr. Justice Nix (joined by Manderino and Packel, JJ.) commits at least six jurisprudential errors: (1) it misapplies this Court's scope of review on appeal and invades the province of the factfinder by making its own findings of fact; (2) it misreads the record in which there is clear and convincing evidence supporting the decree of the orphans' court; (3) it misapprehends and misuses controlling decisions of this Court interpreting section 311(1) of the Adoption Act as amended in 1970; (4) it fails to recognize that the Legislature in 1970 amended the Adoption Act to establish a firm public policy of genuine concern for the essential parental and family needs of children; (5) it misconstrues the express legislative language of section 311(1) of the Adoption Act as amended in 1970 with the result that the Opinion of Mr. Justice Nix reads that section as though the amendatory language had not been enacted; and (6) it disregards the primary role of the Legislature in fixing public policy in adoptions and creates a policy of its own prohibiting adoption whenever the Opinion of Mr. Justice Nix gleans from the record some indication that a parent had a subjective desire to maintain a parental relation with a child even though that desire never surfaced in any affirmative parental conduct demonstrating a discernible and good faith interest in the child.

In August, 1972, appellant H. S., with the apparent consent of her husband, appellant R. S., voluntarily placed her

---

1. Mr. Chief Justice Eagen, Mr. Justice O'Brien, this writer, and Mr. Justice Pomeroy vote to affirm the decree of the orphans' court terminating the parental rights of appellant R. S. Mr. Justice Nix, Mr. Justice Manderino, and Mr. Justice Packel vote to reverse the decree.

Mr. Chief Justice Eagen, Mr. Justice O'Brien, and this writer vote to affirm the decree of the orphans' court terminating the parental rights of appellant H. S. Mr. Justice Nix, Mr. Justice Manderino, and Mr. Justice Packel vote to reverse the decree. Mr. Justice Pomeroy votes to remand the proceedings.

two youngest children, T. M. S., then age four, and D. R. S., then age one, in the custody of appellee, Cambria County Children's Services (Children's Services). Children's Services placed the two children in foster care, where they have since remained. Despite repeated warnings from Children's Services to appellants that their parental rights would be terminated if they failed to make greater efforts to maintain contact with the children and work for the children's eventual return to the home, appellant H. S. managed to visit them only eight times over a three year period. Appellant R. S. visited them only twice in the 21 months before the orphans' court hearing. He last visited them more than a year before the hearing. Upon Children's Services' petition, the orphans' court terminated appellants' parental rights pursuant to section 311(1) of the Adoption Act, which provides for termination of parental rights when it is demonstrated that, for at least six months, a parent has either evidenced a settled purpose to relinquish parental claims to a child, or failed or refused to perform parental duties. Act of July 24, 1970, P.L. 620, art. III, § 311, 1 P.S. § 311(1) (Supp.1977).

The Opinion of Mr. Justice Nix, heedless of this Court's obligation to affirm a decree of the orphans' court supported by competent evidence, selectively re-evaluates the record to substitute its own findings of fact for those of the orphans' court. By this process, the Opinion of Mr. Justice Nix reads the record to conclude that while the children were in foster care, appellant H. S. continuously attempted to reunite her family. Thus, the Opinion of Mr. Justice Nix would reverse the decree terminating her parental rights. The Opinion of Mr. Justice Nix would also reverse the decree terminating the parental rights of appellant R. S., without any attempt to explain why his nearly total indifference to his children while they remained in foster care does not justify the orphans' court's decree.

Moreover, the Opinion of Mr. Justice Nix asserts that a finding that a parent has failed or refused to perform parental duties justifying termination of parental rights pursuant to section 311(1) must be supported by evidence

"equating the dereliction with an intentional abandonment." Such a requirement plainly thwarts the clear intent of the Legislature expressed in the language of section 311(1). Our cases have consistently recognized that parental rights may be terminated when a parent fails to perform parental duties, regardless of the parent's subjective desire to retain the parental relationship.

■ Our scope of review is limited to determining whether the orphans' court's conclusion that appellants failed or refused to perform parental duties for at least six months is supported by competent evidence. E. g., *In re: Involuntary Termination of Parental Rights of S. C. B. and Kelly Taylor,* 474 Pa. 615, 625, 379 A.2d 535, 539 (1977); *Adoption of M.T.T.,* 467 Pa. 88, 91, 354 A.2d 564, 566 (1976); *Adoption of Farabelli,* 460 Pa. 423, 333 A.2d 846 (1975) (plurality opinion); *Shaeffer Appeal,* 452 Pa. 165, 305 A.2d 36 (1973). Findings of the orphans' court supported by evidence of record are entitled to the same weight accorded a jury verdict and must be sustained unless the court committed an error of law or abused its discretion. *Garges Estate,* 474 Pa. 237, 378 A.2d 307 (1977); *In re Wertman Estate,* 462 Pa. 195, 197, 340 A.2d 429, 430 (1975); *Button Estate,* 459 Pa. 234, 239, 328 A.2d 480, 483 (1974); *Cohen Will,* 445 Pa. 549, 284 A.2d 754 (1971); *Holtz Will,* 422 Pa. 540, 222 A.2d 885 (1966); *Hunter Will,* 416 Pa. 127, 205 A.2d 97 (1964). The record clearly supports the determination of the orphans' court that appellants failed to perform parental duties for a period well in excess of the six month statutory minimum.

I

We recently discussed the considerations involved in determining whether parental duties have been met:

"Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative perform-

ance. *In re Adoption of Orwick*, 464 Pa. 549, 347 A.2d 677 (1976); *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975); *Appeal of Diane B.*, 456 Pa. 429, 321 A.2d 618 (1974); *In re Smith's Adoption*, 412 Pa. 501, 194 A.2d 919 (1963). This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. *In re Adoption of McCray*, supra; *Appeal of Diane B.*, supra; *In re Adoption of Jagodzinski*, 444 Pa. 511, 281 A.2d 868 (1971). Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.' *Appeal of Diane B.*, supra, 456 Pa. at 433, 321 A.2d at 620, quoting *In Re: Adoption of J.R.F.*, 27 Somerset L.J. 298, 304–05 (Pa.C.P. 1972)."

*In re: Involuntary Termination of Parental Rights of S. C. B. and K. T.*, supra, 474 Pa. at 624–625, 379 A.2d at 539–540.

█ It is difficult to comprehend how the Opinion of Mr. Justice Nix can conclude that appellants demonstrated a genuine effort to maintain communication and association with their two youngest children, and to maintain a place of importance in the children's lives. While T. M. S. and D. R. S. lingered in the uncertain status of foster care for three of their crucial formative years,[2] appellants bothered to visit them only at sporadic and infrequent intervals, despite the repeated urging of Children's Services that they maintain closer contact and association with the children. The Opinion of Mr. Justice Nix relies solely upon appellant H. S.'s subjective desire for the return of the children during their third year in foster care, and a caseworker's alleged promise, the existence of which is unsupported by the record, that the

2. Both children were previously in foster care for approximately a year beginning December, 1970. Appellants have three older children now living with appellant H. S. All five of appellants' children have been in foster care at some period in their lives, and at various times it has been necessary for the oldest three children to be placed in the care of appellants' relatives. D. R. S., now seven, has been in foster care all but 14 months of his life. T. M. S., now nine, has been in foster care well over half her life.

children would be returned. The Opinion of Mr. Justice Nix ignores the more pertinent and essentially uncontradicted evidence, upon which the orphans' court relied, of appellants' indifferent efforts to maintain any substantial relationship with the children throughout the three years preceding the petition for termination of parental rights.

After T. M. S. and D. R. S. were placed in foster care in August, 1972, appellants did not visit the children for more than four months, until December 26, 1972. Appellants next visited the children in February, 1973, and April, 1973. Appellants did not again visit the children until October, 1973, a period of more than six months.

Rebecca Carlin became the S. family caseworker in October, 1973. The Opinion of Mr. Justice Nix states that "as such her objective *should* have been the reunification of the family" (emphasis added) and unfairly implies that such an effort was not made and that appellants' indifferent efforts to maintain contact with their children were the result of the duplicity of Children's Services. To reach its conclusion, the Opinion of Mr. Justice Nix ignores the bulk of the record and incorrectly presents most of the rest.

The record plainly establishes that, shortly after becoming the S. family caseworker, Carlin repeatedly and vigorously sought to spur appellants to establish more frequent communication with T. M. S. and D. R. S. and take the steps necessary for their eventual return to the home.

On November 2, 1973, shortly after assuming responsibility for the case, Carlin wrote to appellants to instruct them on visitation procedures, to express her willingness to arrange visits and to urge them to see the children:

"I would just like to outline for you what the visiting procedures are so that there won't be any misunderstanding between us in the future concerning this.

"I will be glad to arrange family visits for you if you or your husband call or drop me a note. It will be necessary for me to have at least a week to 10 days notice however. You will then receive a letter giving you the time and date of the visit. Since all of this will be done well in advance

of the visit, I will be expecting you to make your plans carefully too, and to make certain that you have transportation so that the visit doesn't have to be called off at the last minute.

"I have some friends working on finding some clothing for the kids. I don't know what will turn up but we'll wait and see.

"Remember to check when open house at the school is and see if there isn't some way you could plan to be there. I know the kids would really love that."

Appellants' next visit was in December, 1973,[3] after which five months elapsed before another visit in May, 1974. On April 2, 1974, Carlin frankly informed appellant H. S. that, unless she was willing to increase her visits and make a genuine effort to locate adequate housing, she faced a serious possibility of losing her parental rights. Carlin repeated these concerns in a series of letters to H. S. in April and May, 1974, more than a year before Children's Services filed the petition to terminate parental rights.

On April 5, 1974, Carlin wrote:

"I would like to review with you our conversation of April 2, 1974 concerning the future plans for your two children still in foster care. It is our agency's position that we feel you should make some definite move towards securing more adequate and larger housing before we can consider the return of your children. This has been our goal even prior to the time I became your caseworker so that we feel this has dragged on for some time now.

---

3. The Opinion of Mr. Justice Nix states that Children's Services cancelled a scheduled visit in November, 1974. There is no support for this in the record. Carlin testified that appellant H. S. called the day before Thanksgiving, apparently in November, 1973, requesting a Thanksgiving visit the next day. Because visits cannot be set up on such short notice, as appellants were advised in Carlin's November 2, 1973, letter, the visit could not be arranged for that date. Instead, Carlin arranged for the December 14 visit.

Neither appellant testified that Carlin or Children's Services ever cancelled a scheduled visit with the children. On the other hand, Carlin testified without contradiction that appellant H. S. had cancelled scheduled visits.

As we discussed, if you do not attempt to make the necessary changes it may be necessary for us to file for involuntary relinquishment of your children so that they can be assured of what the future will be for them. I do not feel it is fair for them to linger in foster care.

As you know, visiting is at your request. I ask only that you give me adequate notice."

Carlin wrote again on April 26:

"If it is convenient, I would like to visit on Tuesday, April 30, 1974, at about 3:00 P.M. I'm hoping that you will perhaps have some word about the possibility of a new apartment. I think that both of us realize that [T. M. S.] and [D. R. S.] can not come home until you do have larger quarters. Since summer is now approaching I hope you will set a goal of finding a place before school starts in the fall. The weather will be better and this should be to your advantage. You know that we talked before about how long this has been dragging on. It's only fair to your children to do something one way or the other."

Carlin testified she believed it was a result of her urgings that appellant asked her to arrange another visit with the children. Carlin also related, however, that, despite her suggestions concerning agencies and realtors appellant might contact regarding housing, appellant failed to follow up on house hunting efforts. Carlin's letter of May 7, 1974, again reflects concern with appellant's indifference toward the children:

"I have been able to arrange a family visit for you on Wednesday, May 15, 1974 at 1:30 P.M. here in the Court House in Ebensburg. I know that you have always been able to get transportation in the past and there is bus service, however, if you do have difficulty with transportation, please contact me.

I'm hoping to hear that you really did get out and make some personal contacts about a larger apartment after our talk last week. In reality it has been seven months since you and I agreed this was necessary and I know it was a goal of yours even before I became your worker."

Appellant did not request another visit with the children for more than three months and made no substantial effort to secure improved housing. On August 15, 1974, Carlin wrote again:

"I would like to stress to you again how important it is that you make a real effort to find new housing. At the beginning of school vacation we talked about how you must make every effort to get adequate housing. During that entire three month period you had only one apartment for me to look at and even that did not come off as planned. Sleeping arrangements are not satisfactory even for the children who are at home now. If you have any real intention to have your family together, you must begin to show that you care enough to see that you do find a suitable place.

As we discussed before, your children cannot linger in foster care indefinitely. This same situation has continued at least since October of 1973, when I became your worker, until the present. I feel this is more than adequate time for you to have made more suitable arrangements. If this situation continues, I will have no alternative but to go to the Court."

This warning was repeated in a letter to appellant in September, 1974.

Appellant did not visit the children again, however, until December 30, 1974, more than four months after her previous visit. Following the December visit, appellant did not again request that a visit be arranged until after Children's Services filed the petition to terminate parental rights in June, 1975, more than five months later.

Appellant had located larger quarters in October or November, into which she moved in December, 1974. She requested Carlin to inspect the home to see if it was adequate for the return of the children. Carlin visited the home in January, 1975. The Opinion of Mr. Justice Nix attributes to Carlin testimony that a promise was made to appellant at this visit that if she could maintain the house for a couple of months, the children would be returned.

Carlin denied making any such promise. Rather, in relation to appellant's inquiry about when the children might be returned, Carlin testified:

"My reply was that I wanted to see if she was able to maintain the home financially and physically for a reasonable length of time, as this had been her problem in the past. She could pull things together and then everything would fall apart again; but as long as she was able to maintain it, *we would then talk about returning the children*." (emphasis added).

Appellant H. S. testified that after Carlin inspected the house, appellant asked about the children and "[Carlin] said to me that how about if we think about getting some dressers, and would I work at getting some dressers, and I said yes, I would." Appellant testified that she believed this conversation constituted a promise by Carlin that as soon as appellant obtained additional dressers the children would be returned. Carlin testified that she told appellant only that she wished to see if appellant could physically and financially maintain the new residence and, although she may have remarked that it would be helpful to get more dresser space, she in no way indicated that return of the children depended upon obtaining additional dressers.

Neither appellant's testimony nor Carlin's reveals that an express promise was made that the children would be returned if certain conditions were met. At best, the record could support a conclusion that appellant believed that if she could maintain her new residence for a reasonable time and obtain additional dressers, without doing anything more, the children would be returned. The orphans' court, however, made no such finding and Carlin denied that appellant, based on their January conversation, could reasonably have so concluded.

It is unnecessary to determine, however, whether appellant could reasonably have held such a belief, for even if she did, the orphans' court decree should not be reversed. At the time of the January conversation between appellant and Carlin, appellant's children had already been in foster care

for 28 months, and appellant had visited them only infrequently, despite the urgings of Children's Services that she visit more often. Assuming appellant believed, after the January conversation, that her children would eventually be returned, she nonetheless made no substantial efforts to see that the alleged promise was carried out [4] and scheduled no more visits with her children over the following five months. Appellant's misconception, if any, cannot erase from the record her continuing pattern of passive indifference towards maintaining communication and association with her children. Cf. *Davies Adoption Case*, 353 Pa. 579, 587, 46 A.2d 252, 256 (1946) ("Abandonment is not an ambulatory thing the legal effects of which . . . may dissipate at will . . . ."); accord, *In re Smith's Adoption*, supra at 506, 194 A.2d at 922.

The telling facts revealed by the record are that, while T. M. S. and D. R. S. were left to the care of others, appellants made no substantial effort to maintain communication or association with them or a place of importance in their lives.[5]

**4.** There was conflicting testimony concerning whether appellant tried to contact Carlin after their January meeting. Carlin testified that her records did not reveal any calls from appellant after January. Appellant and a neighbor testified that appellant had attempted to call Carlin several times, but that Carlin was usually out. Even assuming appellant attempted to call Carlin, it is simply inconceivable that appellant, with reasonable effort, could not have contacted Carlin at some time over the seven month period before the petition was filed.

**5.** The Opinion of Mr. Justice Nix asserts that the record established "undisputedly" that appellant H. S. was making other substantial efforts to reunite the family, despite her infrequent visits with the children. The record does not disclose any evidence of any such efforts. The main obstacle to the return of the children from foster care was appellant's inadequate housing. The Opinion of Mr. Justice Nix implies that it took three years for appellant to find adequate housing because of her limited income. The record indicates, however, that appellant made no serious effort to locate better housing, despite repeated urgings from her caseworker. For example, appellant's caseworker testified that she and appellant would discuss a possible apartment but, two or three visits later, appellant would still not have followed up on the possibility by contacting the owner. Appellant's caseworker summarized appellant's attitude as follows:

"I was always somewhat surprised that [H. S.] wouldn't be angry at me sometimes when I would visit after the letters I had written

Appellant H. S. made only eight visits in nearly three years, despite convenient bus service to the children, the urgings of Children's Services, offers of assistance in visiting, and, eventually, warnings of the consequences of her inaction. Appellant R. S. made even fewer visits.[6] The only explanations offered by appellants for this neglect were transportation difficulties. Their explanations were, as the orphans' court concluded, "extremely weak and in fact incredible." The record reveals the following testimony by appellant H. S.:

"Q. Didn't you feel that it was important for you to keep knowing your children?

A. Yes.

Q. Well why did you wait intervals of 6 months, 5 months, 4 months, and now 9 months, before you made any attempt to see them?

A. Well from this time to now though, between getting a house ready and everything for them to come home, I've been trying—well I have, and I've done it now.

Q. Well, your other children are in school, so during the day you are home by yourself. Right?

A. Uh-huh.

Q. Wouldn't it be a very, very simple matter for you to get on a bus and come to Ebensburg and see your kids?

A. Yes.

Q. But you didn't do it.

A. No.

to her. I was amazed at her easy-going attitude. She would agree with me that, yes, she had really not gone out house hunting or that, yes, it really wasn't fair for the kids to hang in foster care. She would always agree with me on these things, but she never got around to really doing anything."

6. The record is not clear on how many times appellant R. S. visited T. M. S. and D. R. S., although it was undisputed that he visited them fewer times than this wife. Moreover, R. S. did not contradict the testimony of Carlin and his wife, that on at least one occasion he drove H. S. to a scheduled visit, but remained in the car without visiting the children.

Q. You said that when you came up to visit the children that usually your husband's father, I think you testified 'his dad and them' would bring you up.

A. Yeah, his father has brought me up.

Q. But he wouldn't bring you up in the winter time?

A. No.

Q. Now half of your visits in the last 34 months, according to the agency's records, were in the winter time. How did you get up for those four visits?

A. My husband brought me up.

.　　　.　　　.　　　.　　　.

Q. Why didn't you visit with them more often?

A. I don't know."

Appellant R. S.'s testimony reveals his lack of interest in maintaining communication and association with his children:

"Q. So from January of 1974 until the present time, which is September, [1975] you have seen your children, [T. M. S.] and [D. R. S.] twice; is that correct?

A. In '74?

Q. From '74 until the present time. For 21 months, approximately, to 20 months, you have seen them twice and the last time being in August of 1974. Correct?

A. I thought it was more times.

Q. You tell me when you saw them. I am just stating to you what the agency's records reflect. If they are incorrect, you tell me.

A. That might be true. I don't know.

Q. Did you drive to the hearing yesterday and today?

A. Yes."

This Court has held:

"Parental duty does not require the impossible, but may encompass that which is difficult and demanding. A parent may not yield to every problem, but must act affirmatively, with good faith interest and effort, to main-

tain the parent-child relationship to the best of his or her ability, even in difficult circumstances."

*In re: Involuntary Termination of Parental Rights of S. C. B. and K. T.,* 474 Pa. at 626, 379 A.2d at 541; accord, *In re Adoption of Orwick,* 464 Pa. 549, 347 A.2d 677 (1976); *In re Adoption of McCray,* 460 Pa. 210, 331 A.2d 652 (1975). Even when a family emergency or other crisis results in the removal of children from the home, a parent must utilize all available resources to preserve the parental relationship. *In re: Involuntary Termination of Parental Rights of S. C. B. and K. T.,* 474 Pa. at 625, 379 A.2d at 540; *Adoption of Croissette,* 468 Pa. 417, 364 A.2d 263 (1976); *Adoption of M.T.T.,* 467 Pa. 88, 354 A.2d 564 (1976). Parental duties are not met "by a merely passive interest in the development of the child." *In re: Involuntary Termination of Parental Rights of S. C. B. and K. T.,* supra, 474 Pa. at 625, 379 A.2d at 540.

"Parental rights may not be preserved by complete indifference to the daily needs of a child or by merely waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities (while others adequately provide the child with her immediate and continuing physical and emotional needs)."

*In re Smith's Adoption,* supra at 505, 194 A.2d at 922.

Appellants' indifference towards maintaining communication and association with their children throughout the three years the children have been in foster care constitutes a failure to perform parental duties within the terms of section 311(1). There can be little doubt that, as a result of appellants' conduct, they did not in September, 1975, and for many months prior thereto, hold a place of importance in the lives of T. M. S. and D. R. S. Indeed, appellant H. S. admitted in her testimony that D. R. S. did not even know she was his mother. The Legislature, in enacting section 311(1) contemplated that, when a parent's refusal or failure to perform parental duties results, as here, in a deterioration of the parent-child relationship, parental rights may be terminated to enable the child to establish a new family

relationship through adoption. The unjustifiable reading of the record in the Opinion of Mr. Justice Nix would frustrate this intent.

II

Although the Opinion of Mr. Justice Nix purports to recognize the clear distinction in section 311(1) between termination of parental rights based upon a settled purpose to relinquish the parental claim and termination based upon a failure or refusal to perform parental duties,[7] it would effectively eliminate the alternate nature of these grounds with the asserted requirement that a parent's failure or refusal to perform parental duties must be demonstrated by evidence "equating the dereliction with an intentional abandonment." This interpretation directly contradicts our many cases holding that section 311(1) authorizes termination of parental rights based upon a failure to perform parental duties, despite a parent's subjective desire to retain the parental relationship. E.g., In re: Involuntary Termination of Parental Rights of S. C. B. and K. T., supra, 474 Pa. at 624–625, 379 A.2d at 539–540; Adoption of Croissette, 468 Pa. at 420, 364 A.2d at 265; In re Adoption of Orwick, 464 Pa. at 552 n.4, 347 A.2d at 679 n.4; In re: Adoption of McCray, 460 Pa. at 215 n.6, 331 A.2d at 654–55 n.6; Chester County Children's Services Appeal, 457 Pa. 525, 528, 326 A.2d 377, 379 (1974).

■ Prior to the Adoption Act of 1970, the Legislature required a showing of both a settled purpose to relinquish parental rights and a refusal or a failure to perform parental duties for a minimum period of six months. Act of April, 1925, P.L. 127, § 1, as amended, formerly codified at 1 P.S. § 1 (1963). In 1970, the Legislature amended the Adoption Act to permit termination of parental rights upon

7. Section 311(1) provides:
   "The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties; . . . ."
   1 P.S. § 311(1) (Supp.1977).

a showing of *either* the parent's settled purpose to relinquish parental claims to the child, *or* a refusal or failure to perform parental duties for six months. 1 P.S. § 311(1) (Supp.1977). This Court recognized the effect of the amendment in *In re: Adoption of McCray,* supra:

> ". . . we note that the Adoption Act of 1970 has broadened the grounds for abandonment that existed under prior law. Under the Act of 1925, P.L. 127, § 1, as amended, it was necessary to show *both* a settled purpose to relinquish parental claims *and* a refusal or failure to perform parental duties for a period continuing six months and hence abandonment was construed to be 'largely a matter of intent.' . . . Under the present law, abandonment is established if *either* of the aforesaid grounds are proven and, thus, there will be cases where a parent will forfeit his rights despite a *desire* to remain the parent or where there is no settled purpose to relinquish parental claims."

460 Pa. at 215 n.6, 331 A.2d at 654 n.6 (emphasis in original) (citations omitted).

*McCray's* interpretation of the 1970 amendment was unanimously affirmed in *In re Adoption of Orwick,* supra:

> "Appellant also argues that he did not evidence a 'settled purpose' of relinquishing his parental rights and that this renders an involuntary termination and adoption impermissible. This is incorrect. Although a 'settled purpose' of abandoning a child was formerly required before an involuntary termination of one's rights was in order, the 1970 Adoption Act eliminated that as an essential requirement and today an adoption may be permitted under the second clause of Section 311(1) *without any proof of an intent to abandon.*"

464 Pa. at 552 n.4, 347 A.2d at 679 n.4 (emphasis added) (citations omitted). Thus, our cases have consistently recognized that the Legislature, by providing for termination based upon a failure or refusal to perform parental duties *or* a settled purpose to relinquish the parental claim, created alternate grounds for termination.

The Opinion of Mr. Justice Nix departs from the express language and intent of the Legislature and our caselaw by reading the Adoption Act of 1970 as though the amendment had worked no change in the standard for terminating parental rights. There is no essential difference between a showing of a "settled purpose of relinquishing parental claim to a child" and a showing of conduct equivalent to an intentional abandonment. Under the view of the Opinion of Mr. Justice Nix, termination of parental rights once more becomes primarily a question of parental intent regardless of the needs of the child. See *In re Adoption of McCray,* supra at 215 n.6, 331 A.2d at 654 n.6, citing *Harvey Adoption Case,* 375 Pa. 1, 99 A.2d 276 (1953). The interpretation urged by the Opinion of Mr. Justice Nix that failure to perform parental duties must be accompanied by conduct equivalent to an intentional abandonment nullifies the Legislature's effort to "broaden the grounds" for termination of parental rights. *In re: Adoption of McCray,* supra.

Underlying both the Adoption Act of 1970 and the decisions of this Court is a strong concern for the rights of parents. The Legislature in 1970 determined that the interest of the child must prevail upon a clear showing of failure or incapacity to perform parental duties or of a settled purpose to relinquish parental claims, any of which extends for at least six months. It was the Legislature's responsibility to establish this standard; it is our responsibility to respect it.

In urging reversal of the decree of the orphans' court, the Opinion of Mr. Justice Nix misreads the record and substitutes its erroneous conception of section 311(1) for that of the Legislature. This position, contrary to our caselaw and based upon a policy rejected by both the Legislature and this Court, exalts the subjective desires of parents over the essential needs of children for the parental care and affection of a family home. The decree of the orphans' court is clearly supported by competent evidence and should not be disturbed.

EAGEN, C. J., and O'BRIEN, J., join in this opinion.

## CONCURRING AND DISSENTING OPINION

POMEROY, Justice.

I share the view of Mr. Justice Nix that there is insufficient evidence in the record to support the finding of the trial court that H. S. failed to perform parental duties with respect to T. M. S. and D. R. S. for a period of 6 months in violation of § 311(1) of the Adoption Act.[1] Nonetheless, I am obliged to write this separate statement because I disagree with the disposition which Mr. Justice Nix proposes and because, in my view, the reasoning of his opinion with respect to H. S. does not apply to her husband. Accordingly, I would affirm the decree of the lower court with respect to the natural father, R. S., and remand for further proceedings with respect to the natural mother, H. S.

### I.

It may be worthwhile, initially, to repeat what I understand to be the proper role of the courts in cases where a petitioner seeks to terminate, involuntarily, the rights of a natural parent: The burden is on the proponent of the termination to establish "by a preponderance of the evidence that the demanding requirements of § 311 (n.1, *supra*) are present." *In Re Howard* (Plurality Opinion), 468 Pa. 71, 76, 360 A.2d 184, 186 (1976); *In Re Adoption of McAhren*, 460

1. Section 311 of the Adoption Act, Act of July 24, 1970, P.L. 620, 1 P.S. § 311 provides as follows:
   "§ 311. Grounds for involuntary termination
   The rights of a parent in regard to a child may be terminated after a petition filed pursuant to section 312, and a hearing held pursuant to section 313, on the ground that:
   (1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties; or
   (2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent; or
   (3) The parent is the presumptive but not the natural father of the child."

Pa. 63, 331 A.2d 419 (1976); *In Re Geiger,* 459 Pa. 636, 331 A.2d 172 (1975). To satisfy the requirements under § 311(1) (the section with which the present appeal is concerned) it is necessary for the petitioner to show either (1) that a refusal or failure to perform parental duties or (2) that a settled purpose to relinquish parental claim to the child has existed for a period in excess of six months. 1 P.S. § 311(1); *Adoption of Croissette,* 468 Pa. 417, 364 A.2d 263 (1976); *In Re Howard, supra; In Re Adoption of Orwick,* 464 Pa. 549, 347 A.2d 677 (1975).[2] Only if it finds that this burden has been met should the trial court decree termination. Should there be an appeal from a decree of termination, the task of the appellate court is to review the record and ascertain whether there is competent evidence to support either a finding of parental failure or an intentional relinquishment of parental rights. *In Re Adoption of M.T.T.,* 467 Pa. 88, 354 A.2d 564 (1976); *In Re Howard, supra; In Re Adoption of Farabelli,* 460 Pa. 423, 333 A.2d 846 (1975). If there is competent supporting evidence in the record, and all legal conclusions based thereon are proper, the decree of the trial court must be affirmed, whether or not the reviewing court would itself have decreed termination were it sitting as a court of first instance. Where, however, the facts fail to support the legal conclusions reached by the court below, it is the duty of the appellate court to apply the correct law to those facts as determined by the trial court.

## II.

With this standard of review in mind, I think it readily apparent that the record contains ample evidence to establish that the natural father, R. S., has indeed, for a period in excess of six months, failed to perform even the barest of parental duties. During the hearing R. S. testified that he had not visited T. M. S. or D. R. S. in over eighteen

---

**2.** In this respect, I agree with the opinion of my brother Roberts that the Mr. Justice Nix's characterization of the § 311(1) test as requiring evidence "equating dereliction with an intentional abandonment" is contrary to the legislative intent indicated in the 1970 amendments to the Adoption Act. *See In Re Howard, supra.*

months (despite frequently available transportation) and, as his only excuse, noted that he had been having "bill troubles." But, as we stated in *In Re Smith's Adoption*, 412 Pa. 501, 194 A.2d 919 (1963), parents may not wait for "some more suitable financial circumstances or convenient time for performance of parental duties and responsibilities (while some other [person] adequately provide[s] the child['s] immediate and continuing physical and emotional needs)." 412 Pa. at 505, 194 A.2d at 922. It is to be observed, moreover, that although R. S. failed to visit T. M. S. or D. R. S., he nevertheless was able to visit his ailing father in the hospital every day for two months, and to visit his wife and other children [3] every other day during the period which forms the basis of this litigation. There is, then, substantial evidence to support the lower court's termination of R. S.'s rights in his children T. M. S. and D. R. S. and that adjudication should not be disturbed on appeal, regardless of what might be the final decision with respect to H. S. See *In Re Involuntary Termination of Parental Rights of S. C. B. and K. T.*, 474 Pa. 615, 379 A.2d 535 (1977).

### III.

Turning now to the appeal of H. S., my review of the record satisfies me that the evidence adduced at trial failed to substantiate the trial court's legal conclusion that H. S. had, for a period in excess of six months, failed to perform parental duties.[4]

It is true, as the opinion of the lower court and that of Mr. Justice Roberts set forth in detail, that there were numerous occasions of parental failure or neglect on the part of H. S.

---

**3.** The record discloses that Mr. and Mrs. S. were living apart at this time but were attempting a reconciliation. While these facts are not recited to indicate that R. S. should have visited T. M. S. and D. R. S. to the exclusion of these other family members, the facts do demonstrate that where desire or concern was present, R. S. was able to find the time and the means to visit loved ones.

**4.** It is nowhere argued that H. S. evidenced a "settled purpose" to relinquish parental rights nor does the record indicate that any such purpose did in fact exist.

over the two and one-half year period in question. I am not convinced, however, that any of these instances continued for as long as a six-month period which is required for statutory abandonment under § 311(1). See, e. g., *In Re Involuntary Termination Petition of Parental Rights of S. C. B. and K. T., supra; In Re Howard, supra; In Re Adoption of Orwick*, 464 Pa. 549, 347 A.2d 677 (1976); *In Re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1976); *In Re Cassen*, 457 Pa. 525, 326 A.2d 377 (1974); *In Re Smith Adoption, supra.*[5] The only specific reference to any statutory six-month period of abandonment[6] is found in the opinion of Mr. Justice Roberts in which he determines that the period from the last visit of H. S., December 30, 1974, until the filing of the termination petition on June 13, 1975, satisfies the statutory requirement. The difficulty with this conclusion, however, is that this period falls short of six months by approximately one-half a month.[7] Other relevant facts concerning this period are that H. S. had rented, repaired and was attempting to maintain a residence which the agency itself had noted was suitable for the return of T. M. S. and D. R. S.; that at the agency's suggestion and in anticipation of the children's return H. S. had undertaken to acquire

**5.** It is true that from April 17, 1973 until October 19, 1973, a period of 6 months and 2 days, no visits from H. S. to her children took place. The present petition was not filed, however, until some two years subsequent to the end of that period. During that time, prior to the filing of the present petition by Cambria County Children's Service (the agency), the agency actively encouraged H. S. to obtain more suitable living arrangements, and H. S. did indeed make such efforts and actively worked with the agency for the return of the children. In my view it would be most unfair to rely upon the antecedent six-month time period (i. e., prior to October 19, 1973) as satisfying the requirements of § 311(1) of the Act.

**6.** I say this because the lower court opinion addresses itself to no specific period of time; it simply concludes that the parental incapacity has existed in excess of six months.

**7.** The record shows that H. S. again requested visitation one week after the petition was filed but that the request was denied by the agency. Evidence of parental fitness pertaining to periods subsequent to the filing of a termination petition are not, however, relevant to a determination of whether abandonment has in fact occurred. See *Adoption of McCray, supra.*

other furniture; and that H. S. had made unsuccessful efforts to get in touch with the agency during the period in question. To conclude that H. S.'s activities during this period fail to surpass the minimum requirements of parenthood not only greatly departs from prior case law but establishes a test more burdensome than I believe was intended by § 311(1) of the Adoption Act.[8] For the foregoing reasons I believe that the termination of H. S.'s parental rights under § 311(1) was in error and should be reversed.

## IV.

It does not follow, however, that simply because the test under § 311(1) has not been met with respect to H. S., the petition as to her should be dismissed. The petition alleged both a failure under § 311(1) and a "continued incapacity" under § 311(2). While the decree of the lower court refers to "continued incapacity", it confines its findings to a six-month period and purports to reach its conclusions under § 311(1). The decree is, therefore, somewhat ambiguous.[9]

**8.** It is true, as Mr. Justice Roberts notes, that many of the affirmative actions on the part of H. S. occurred only after prolonged encouragement by the agency. The fact remains, however, that they did occur during the six-month period in question. While consistent inability on the part of a parent to effect immediate and necessary change in living arrangements and conditions is pertinent to a continued incapacity test under § 311(2), see n. 1, *supra*, such inability is, in my view, irrelevant under § 311(1) unless it has continued over a particular six-month interval.

I am satisfied that these efforts (noted above) on the part of H. S., coupled with the visitation of the child, all of which transpired during the six-month period in question, are sufficient to render erroneous the conclusion of Mr. Justice Roberts that there elapsed a period of abandonment sufficient to satisfy the Adoption Act.

**9.** In concluding his opinion, the learned trial judge stated:

"In view of the foregoing, we find that the rights of these parents to these children should be terminated *under the provisions of Section 311(1) of the Adoption Code.*" (Emphasis supplied.)

The decree which was then immediately entered reads in relevant part as follows:

"AND NOW, March 22, 1976, after hearing and consideration of the testimony and the briefs, the Court finds that [R. S.] and [H. S.] *have evidenced a continued incapacity to care for their children,* [T. M. S.] and [D. R. S.], minors under 18 years of age, for a period of more than six months, and that said children have been under

Without intending to express an opinion as to its sufficiency, I find that there is some evidence in the record that H. S. suffers from a "continued incapacity" to raise her children under § 311(2).[10] I would therefore remand the case to the court of common pleas for a definitive determination as to whether or not involuntary termination may properly be ordered on incapacity grounds under § 311(2) of the Adoption Act.

## OPINION IN SUPPORT OF REVERSAL

NIX, Justice.

This is an appeal from a decree of the Cambria County Court of Common Pleas, Orphans' Court Division, which involuntarily terminated the parental rights of R. S. and H. S. to their minor children, T. M. S., age 7, and D. R. S., age 5.[1] The case arose as a result of a petition filed on behalf of the Cambria County Children's Services requesting the termination of parental rights pursuant to the Adoption Act of 1970, July 24, P.L. 620, No. 208, art. III, § 311, 1 P.S. § 311 (Supp.1977–78). After a review of the lower court opinion, it is evident that the termination was based on Section 311(1)[2] of the Act which permits such action *either* if the parent has evidenced, for a period of six months, a "settled purpose" of relinquishing the parental claim *or* has, for the same length of time, "refused or failed to perform parental

the care of the Cambria County Children's Services since the 9th day of August, 1972.

"It is therefore ordered and decreed that the parental rights of [R. S.] and [H. S.] to their children, [T. M. S.] and [D. R. S.], be terminated . . . ." (Emphasis supplied.)

10. Compare *Adoption of R. I.*, 468 Pa. 287, 361 A.2d 294 (1976), with *In Re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975).

1. Jurisdiction of the instant appeal is vested in this Court under the Appellate Court Jurisdiction Act of 1970, July 31, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp.1977–78).

2. Section 311(1) provides:

"The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties; . . . ."

duties."[3]  We have often stated that subsection 311(1) is in the disjunctive and that an involuntary termination may be ordered if either of these situations are found to exist.  *In re Adoption of M.T.T.*, 467 Pa. 88, 354 A.2d 564 (1976);  *Chester County Children's Services Appeal*, 457 Pa. 525, 326 A.2d 377 (1974);  *Wolfe Adoption Case*, 454 Pa. 550, 312 A.2d 382 (1973).  However, the court below did not address the question of which exigency was the foundation for their action. As a consequence it is necessary to determine whether the agency has proven by a preponderance of the evidence that parental rights should have been terminated under either the "settled purpose to relinquish" test or "the refusal or failure to perform parental duties" test.  *See, In re Involuntary Termination of Parental Rights and Adoption of Baby Girl Fleming*, 471 Pa. 73, 369 A.2d 1200 (1977);  *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975);  *In re Adoption of McAhren*, 460 Pa. 63, 331 A.2d 419 (1975).

The power of the state to sever a parent-child relationship is awesome and irreversible, and in a society committed to the respect of human dignity the exercise of that power must be with utmost restraint.[4]  Before parental rights may be involuntarily terminated, the proponents of the termination must establish by a preponderance of the evidence that

3.  Although the petition of the Cambria County Children's Services included an allegation that termination was justified under Section 311(2) of the Adoption Act, the lower court did not express an opinion on whether there existed the "repeated and continued incapacity, abuse, [or] neglect" which caused the child to be "without essential parental care, control, or subsistence" and which could not and would not be remedied.  Act of 1970, July 24, P.L. 620, No. 208, art. III, § 311(2), 1 P.S. § 311(2) (Supp.1977–78).  Nevertheless an independent review of the record shows that an order of involuntary termination could not have been based upon the provisions of this particular section.  Even if there had been evidence of *repeated* and *continued* incapacity, abuse, or neglect, a finding I reject, no testimony whatsoever was adduced concerning the inability or unwillingness of the parents to remedy the situation.  To the contrary, the record clearly demonstrates efforts by the parents to provide a better living environment for their children.

4.  "Moreover, even if removal is necessary to protect the child, every effort should be made to reunite the family."  *In re Adoption of R.I.*, 468 Pa. 287, 294, 361 A.2d 294, 298 (1976).

the demanding requirements of our law for such action have been met. *In re Howard*, 468 Pa. 71, 360 A.2d 184, 186 (1976); *In re Adoption of Farabelli*, 460 Pa. 423, 427, 333 A.2d 846, 848 (1975); *In re Adoption of McAhren, supra; In re Geiger*, 459 Pa. 636, 637, 331 A.2d 172, 173 (1975).

The testimony offered below shows that the appellants are the natural parents of five children whose ages range from thirteen years to five years.[5] The two youngest children, T. M. S. and D. R. S., are the subjects of this controversy. In the summer of 1972, the appellant R. S. departed from the family home allegedly due to a "drinking problem" from which his wife suffered. By August of the same year, H. S., apparently unable to resolve her problem and to cope with the difficulties in caring for her children, contacted Cambria County Children's Services. The agency succeeded in housing the eldest S. children with relatives and in placing, upon H. S.'s signing a voluntary placement agreement, T. M. S. and D. R. S., in foster homes. By November, H. S. was well enough for the older children to be returned to her; however, due to the inadequacy of the apartment which the family inhabited, the two younger children remained under foster care. A series of visits by both parents were arranged by the agency and took place at agency headquarters on the following dates: December 26, 1972, February 21, 1973, April 17, 1973, October 19, 1973, December 14, 1973,

5. This Court has stated that the Adoption Act provides for termination of parental rights only in connection with a plan for a contemplated adoption. *In re: Male Infant B.E.*, 474 Pa. 139, 377 A.2d 153 (1977). Because I am of the view that the proponents of the petition have failed to establish a course of conduct on the part of H. S. which would support a finding of termination of her parental rights under § 311(1), I have made no effort to distinguish between the actions of H. S. and those of R. S. towards their children. Since any contemplated adoption plan of the agency would necessarily be frustrated by a decision dismissing a petition as to the natural mother, no purpose would be served by continuing the inquiry to seek a basis for sustaining the lower court's action as to the father. Unlike a situation where a natural mother is contemplating another marriage and the adoption of her children by her prospective husband, here the termination of the father's right would provide, at this time, no benefit for the children. To the contrary, the severance of this relationship could conceivably inure to the detriment of the children.

May 15, 1974, August 23, 1974, and December 30, 1974. A scheduled November, 1974 visit was cancelled by the agency. The evidence reveals that between the last parent-children meeting in December of 1974 and June 1975, when the petition was filed by Children's Services, H. S. had on several occasions contacted both the agency and the respective foster families inquiring into the welfare of her two children. The evidence also suggests that from the date the petition was filed both parents have been denied further visitation rights.

In discussing the conduct necessary to establish the existence of a "settled purpose of relinquishment" of parental rights, this Court stated:

"Section 311(1) 'has been interpreted as requiring a deliberate decision on the part of the parent to terminate the parental relationship and that parent must persist in that determination throughout the six-month period.' *In re Adoption of Farabelli*, 460 Pa. 423, 430–431, 333 A.2d 846, 850 (1975). The term 'settled purpose' implies a finality of purpose. *Wolfe Adoption Case*, 454 Pa. 550, 312 A.2d 793 (1973). In our efforts to determine if such a purpose was present, this Court has required an 'affirmative indication of a positive intent' to sever the parental relationship before we have upheld an involuntary termination. *In re Adoption of McAhren*, 460 Pa. 63, 70, 331 A.2d 419, 423 (1975); *Wolfe, supra. In re Adoption of Baby Girl Fleming, supra*, 471 Pa. at 76, 369 A.2d at 1202.

In keeping with the concept of requiring an "affirmative indication" of the requisite intent, we held that "even inaction or lack of interest in a child for a period in excess of six months will not conclusively establish the required settled purpose of relinquishment". *In re Adoption of Farabelli, supra*, 460 Pa. at 430, 333 A.2d at 850. Further, a recanted voluntary termination petition has been held to be inadequate to support an involuntary termination under this theory where the petition was withdrawn before a final decree, even though custody had been relinquished for a period of time in excess of six months. *Sheaffer Appeal*, 452 Pa. 165, 305 A.2d 36 (1973).

The hearing court placed great stress upon the irregularity and infrequency of the visits by the parents during the time that the children were not in their custody. While this fact may be of significance in determining whether there was a "refus[al] or fail[ure] to perform parental duties" it could hardly represent the type of "affirmative indication" of the existence of a "settled purpose" to sever their relationship with their children. To the contrary, the visits negate rather than support the inference that Mr. and Mrs. S. had made a determined choice to sever their relationship with their two youngest children. That appellants did not in fact entertain the finality of purpose to relinquish their parental rights as required by our law is buttressed by competent and unrefuted evidence that they took positive steps to remedy their domestic problems for the purpose of creating a home environment suitable for raising their family. H. S. acquired larger and more adequate housing and obtained additional furniture. Upon inspection, at H. S.'s request, the premises were found to be adequate.

Having determined that there was no testimony sufficient on this record to sustain appellee's burden of affirmatively demonstrating the existence of a "settled purpose," one must look to the second clause of Section 311(1) to ascertain whether or not the decision of the hearing court can be upheld under its provisions. Our cases have repeatedly noted that "parenthood is not a mere biological status, or a passive state of mind." *Appeal of Diane B.*, 456 Pa. 429, 433, 321 A.2d 618, 620 (1974) (quoting *Adoption of J.R.F.*, 27 Somerset L.J. 298, 304 (Pa.C.P.1972)). A parent has an affirmative duty to love, protect and support one's children and to maintain communication and association with them. *In re Adoption of M.T.T., supra; In re Adoption of McCray, supra; In re Matter of Kapcsos*, 468 Pa. 50, 360 A.2d 174 (1976); *In re Adoption of Orwick*, 464 Pa. 549, 347 A.2d 677 (1975). The affirmative responsibility of performing the parental obligations may be met by one other than the parent where it is shown that the parent has made reasonable arrangements for this temporary care. *In re Howard,*

*supra; Wolfe Adoption Case, supra.* A parent who makes suitable arrangements for the care of a child during a period of personal crisis does not by that act alone fall within the proscription of failing or refusing to perform parental duties. *In re Howard, supra.* The test to be employed is whether a parent has utilized available resources in overcoming the obstacles which temporarily precluded personal supervision of the child's welfare and whether the parent exercised reasonable firmness in declining to yield to obstacles which may make personal care of the child difficult. *In re Adoption of McCray, supra; In re Adoption of Orwick, supra.*

Under the facts of this case, the parents were forced to relinquish their children temporarily during a period of personal crisis. Accepting the fact that the family break-up was largely as a result of H. S.'s alcoholism, whatever blame that might be assigned to H. S. from this fact is offset by her prompt and diligent efforts to remedy her drinking problems. The record also demonstrates that although the family was required to exist on a meager income provided by public assistance, they were able to ultimately obtain and furnish premises that were found to be adequate for the housing of their entire family. A review of the actions of the natural mother during the year preceding the filing of the petition for involuntary termination is particularly illuminating. The record indicates that in October of 1973, Ms. Rebecca Carlin was appointed as caseworker for the family and as such her objective should have been the reunification of the family. The most significant obstacle to that end was the need to obtain appropriate housing for the family unit. At this point, H. S. resided with her three older children and subsisted on a grant of $308.00 per month. Nevertheless, she secured other lodgings in October of 1974. Because this residence required extensive repairs, it took until December of 1974 for the rehabilitation to be completed. On her own initiative, H. S. requested in December of 1974 that the premises be inspected. This request was granted and the caseworker testified that the home was adequate and that

promises were made to H. S. that if she could maintain the home reasonably for another two or three months, the children would be returned. Although the evidence establishes that the home was in fact maintained, the promise was not kept but rather the agency responded by filing a petition to terminate. Ms. Carlin's testimony, which sought to explain the apparent contradiction between her promise and the actions of the agency, leaves much to be desired as is indicated by the following excerpt from the record:

Q . . . I mean, I can't understand; you indicated to [H. S.] that you wanted to see if she could maintain her home reasonably and physically until their return, and then the next time you visited her it was in June with a petition?

A . . . Well, I also indicated to her in a letter in November that I thought it would be good for her to visit approximately once a month, and that all she had to do was contact me . . . to pick up a telephone or send a postcard, and she knows she will get a response.

. . . . .

Q . . . From January, 1975, to June of 1975, you did not have the occasion to visit [H. S.'s] home is effect [sic] to see whether it was okay for the return of the children?

A . . . I felt that this was not necessary nor my responsibility because I was keeping informed of it through the schools and through the D.P.A. caseworker. We hold a regular monthly conference, and we discuss certain mutual cases.

Q . . . But you, yourself never viewed the home?

A . . . I felt the home was adequate in January.

Q . . . But didn't you want to see if she could maintain it?

A . . . The D.P.A. worker worked with her about financing and budgeting. I checked with Mrs. Makin the guidance counselor at Meadowvale School, who confirmed that the children's attendance record had been very good in fact I have the days missed and tardies and so on, and

they are very few, like 3 out of 117 days; so I felt I knew what was happening in the [S. family] home."

Further, the testimony of appellant disputes the fact that there were no telephone calls between the January inspection and the filing of the petition. To the contrary, she testified that she did on several occasions attempt to reach the agency by phone to inquire as to the welfare of her children and when they were to be returned. Further, her testimony was corroborated by a neighbor who stated that she recalled H. S. borrowing her phone for the stated purpose of calling the agency. Although the lower court made no express finding as to whether or not these attempts were made, even if one were to find from his ruling an implicit rejection of this testimony, that would nevertheless not support an order of termination.

It is most significant that the court below in its opinion avoided specifying the six-month period required by § 311(1). Mr. Justice ROBERTS, in his opinion in support of affirmance, attempts to rectify this glaring omission by suggesting a period between the last visit, December 30, 1974, and the filing of the petition for termination by the agency on June 13, 1975. The obvious defect in such a proposition is that the interim period is less than six months.[6] While it may be argued that the requisite six-month period as required by § 311(1) may be found during a period where a parent, who has voluntarily placed custody of the child in another, has visited that child during the period in question, my research has not disclosed a case where this Court has made such a

---

6. Furthermore, it is difficult to justify beginning the computation of the required six-month statutory period at the last visit in December of 1974. It was at this time that she requested the inspection which did not occur until January 7, 1975. The inspection was requested as a means to facilitate the return of the children, thus it cannot be said that between the December visit and the January inspection that H. S. was indifferent to the welfare of her two youngest children. Furthermore, at the time of the inspection, H. S. was led to believe that her children would be returned within the two-month period following that promise, H. S.'s efforts to comply with the stated conditions for the return of her two children must also be considered as an affirmative effort to meet parental responsibility. *Cf. In re Adoption of M.T.T., supra.*

determination.[7]  The reluctance to make such a determination is the result of our desire to avoid termination of parental rights where there has been a manifestation of affirmative parental conduct demonstrating a discernible and good faith interest in the child.

In summary I cannot find any period of a six month duration where it can be said that H. S. was not *in some way* making an affirmative effort to restore her family unit.  It must be remembered that even though Section 311(1) somewhat relaxed the more stringent requirements of its precursor, it nevertheless requires proof of intent where refusal or failure to perform parental duties is charged, however, the nature of the refusal or failure to perform must be of such magnitude as to justify equating the dereliction with an intentional abandonment.  Although this Court has repeatedly stated that parenthood must necessarily entail the responsibility of providing a constant affirmative demonstration of parental love, protection and concern, we have never suggested that this standard be construed to make all but a model parent subject to the possibility of the termination of his or her parental rights.[8]  Recognizing the frailties

**7.** The only period in excess of six months between visits by H. S. to her children occurred between April 17, 1973 and October 19, 1973 (a period of six months and two days).  This period, however, preceded the filing of the petition for involuntary termination by approximately two years.  It is obvious that it was not intended by the legislature to permit reliance for purposes of terminating parental rights on a statutory period which was so remote particularly where the period barely meets the minimum time required.

**8.** Judge Woodside in discussing the state's power to remove a child from his natural parents observed:

"A child cannot be declared 'neglected' merely because his condition might be improved by changing his parents.  The welfare of many children might be served by taking them from their homes and placing them in what the officials consider a better home.  But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy."

*Rinker Appeal,* 180 Pa.Super. 143, 148, 117 A.2d 780–783 (1955).

of human nature, one must necessarily construe Section 311(1) to require conduct (commission or omission) which reasonably warrants a conclusion of abandonment. The fact that appellant might have been remiss in her visitation pattern, where the record undisputedly established that during that period she was making other substantial efforts to restore the family unit, could hardly justify a finding of abandonment.

Having determined that the record does not sustain the involuntary termination of parental rights under either clauses of Section 311(1), I would reverse the decree entered by the court below and direct that the petition for involuntary termination be dismissed.

MANDERINO and PACKEL, JJ., join this opinion.

Although these comments were made in the context of a consideration of the state's right to place custody of a child in one other than the natural parent, the import of these remarks have an even greater significance where the state is exercising its sovereign power to disenfranchise a parent of a gift bestowed by a force far superior than any source from which the state derives its power.