360 A.2d 184
**In re Latasha HOWARD.**
**Appeal of Julius DENSON and Lottie Denson.**

Supreme Court of Pennsylvania.

Argued March 12, 1976.

Decided July 6, 1976.

74

Carl M. Moses, Sharon, for appellant.

Nicholas Mamone, Jr., David J. Graban, Legal Services for Northwestern Pa., Sharon, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

POMEROY, Justice.

This is an appeal by Julius and Lottie Denson from a denial of their petition to terminate involuntarily the parental rights of Lucille M. Daoust [1] in her infant child, Latasha Howard, of whom the Densons are legal guardians. The petition prayed that Miss Daoust's parental rights be terminated under either § 311(1) or § 311(2) of the Adoption Act of 1970, Act of July 24, 1970, P.L. 620, 1 P.S. § 311 [hereinafter referred to as § 311].[2] After a hearing the trial court concluded that the legal justifications for involuntary termination of parental rights set forth in § 311 had not been demonstrated, and refused to terminate the parental rights of Miss Daoust. The Densons have appealed this decision. We affirm.

■■■ This Court has frequently acknowledged the severity of the emotional impact which attends a court decree terminating against the wishes of a natural father

1. We hear this appeal pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp.1975).

2. The petition also prayed for custody of Latasha. Although the hearing judge refused to terminate Miss Daoust's parental rights, he did award custody of the child to the Densons. The custody order has not been appealed and will not, therefore, be dealt with in this opinion.

or mother, his or her parental rights in a child. See, *e. g., In re Adoption of M. T. T.*, 467 Pa. 88, 354 A.2d 564, 568 (1976); *Sarver Adoption Case*, 444 Pa. 507, 509–510, 281 A.2d 890, 891 (1971). Before parental rights may be involuntarily terminated, the proponent of the termination must establish by a preponderance of the evidence that the demanding requirements of § 311 are present. *In re Adoption of Farabelli*, 460 Pa. 423, 427, 333 A.2d 846, 848 (1975); *In re Adoption of McAhern,* infra; *In re Geiger,* 459 Pa. 636, 331 A.2d 172, 173 (1975). When a hearing judge concludes that this burden has not been met, his decision will be disturbed on appeal only if it is not supported by competent evidence. See *e. g., In re Adoption of Farabelli,* supra. In this appeal, the Densons contend that the evidence presented at the hearing satisfies the standards of both § 311(1) and § 311(2). As indicated above, we do not agree. For convenience, we shall treat appellants' contentions in reverse order.

I

Section 311(2) of the Adoption Act states that parental rights may be involuntarily terminated on the ground that:

> "[t]he repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent."

Under the terms of the section it is not sufficient merely to establish that repeated and continued incapacity, neglect or refusal of the parent caused the child to be without essential parental care; it is necessary to show also that the causes of the incapacity, abuse or neglect cannot

or will not be remedied by the parent. *In re Geiger,* supra. Manifest in the provision is a legislative judgment that, regardless of a parent's past transgressions, a court should not terminate parental rights if the parent stands ready and able to assume the responsibility of rearing his or her child. In the case at bar the hearing judge, noting Miss Daoust's improved living conditions and her continued love for the child, concluded that it would be improper at this time to terminate her parental rights under § 311(2). For the reasons which follow we are satisfied that this conclusion was sound.

■ Latasha was born in Anne Arundel County, Maryland on July 25, 1973. Lucille Daoust was then nineteen years old and the putative father was incarcerated. The parents have never lived together and the father has never contributed to the financial or emotional support of the child. Lucille, who has not completed her high school education, attempted for eleven months to raise Latasha through public assistance and part-time employment. During this period mother and daughter subsisted in extreme poverty. Not only were their living conditions squalid, but Latasha was clothed in hand-me-downs which frequently were too large, was fitted in shoes which were much too small, and was not fed a proper amount of solid foods. In June of 1974, Miss Daoust, upon the advice of a social worker and motivated by her evident frustration with her then life situation, agreed to allow the Densons to assume custody of Latasha.[3] Following this placement, Lucille's living conditions improved markedly. By the time of the involuntary termination hearing, she had become engaged to be married to a soldier who had a good paying job awaiting him upon his impending discharge; she had secured full

---

**3.** The Densons were residents of Mercer County, Pennsylvania, and were relatives of a Mrs. Braddock, a friend of Lucille's in Maryland who frequently and for long periods acted as "babysitter" for Lucille.

time employment on a regular basis and was no longer receiving public assistance; and she had made arrangements to move into a two bedroom apartment in a low-income housing complex. Under these circumstances it cannot be said that Lucille's incapacity or neglect to furnish the requisite parental care cannot or will not be remedied. Thus we conclude, as above stated, that the hearing judge was correct in finding that Lucille Daoust's rights should not presently be terminated under § 311(2).[4]

## II

Section 311(1) of the Adoption Act provides that parental rights may be involuntarily terminated on the ground that: "[T]he parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties." No claim is made that Lucille Daoust ever entertained "a settled purpose" to relinquish claim to her child. Appellants' claim is that the evidence justified the involuntary termination of Miss Daoust's parental rights because she had "refused or failed to perform parental duties". This contention is advanced on two alternative evidentiary grounds: (1) that for a six month period between December 1973 and June 1974, Lucille improperly fed, clothed, housed and cared for Latasha; and (2) that Lucille relinquished custody of the child and thereafter for a period in excess of six months commencing in June,

4. Because Miss Daoust has not been shown to be incapable or unwilling to remedy the causes of her alleged former neglect, we need not discuss whether the conditions of poverty under which Latasha was raised constituted abuse or neglect "which caused the child to be without essential parental care." § 311(2). As a consequence we are also not required to rule on appellant's contention that the hearing judge impermissibly excluded as hearsay certain testimony which tended to establish the alleged instances of neglect.

1974, failed to give her proper parental support. We shall deal with these grounds seriatim.

██ (1) Appellants' first evidentiary assertion is founded on parental conduct which allegedly occurred while Lucille still had custody of Latasha. Such an assertion, however, may not properly be entertained under § 311(1). A review of both the historical origins of § 311(1) and the statutory context in which it appears persuades us that that subsection does not authorize involuntary termination on the basis of parental neglect which occurs during a period when the parent has custody of the child. As explained hereafter, we think that relief from such custodial neglect must be obtained under § 311(2) of the Act. Section 311(1) represents a liberalization of the more stringent standards of parental abandonment contained in the predecessor Adoption Act, Act of April 4, 1925, P.L. 127, § (1)(a), repealed by Act of July 24, 1970, P.L. 620, 1 P.S. § 601. *In re Adoption of McCray*, 460 Pa. 210, 215, 331 A.2d 652, 654 n. 6 (1975). Under the former Act *both* a settled purpose of relinquishing parental claim to the child *and* a failure or refusal to perform parental duties were necessary, dependent elements of proof of abandonment. Settled purpose was defined as a positive intent to sever parental relations,[5] and, without proof of such intent, a

---

5. See, *e. g., Harvey Adoption Case*, 375 Pa. 1, 6, 99 A.2d 276, 279 (1953), where this Court held:

"For a mother to abandon her child means to give it up absolutely with the intent of never again claiming her right to it. Mere neglect does not necessarily constitute abandonment; ordinarily, to have that effect, it must be coupled with affirmative acts or declarations on her part indicating a positive intention to abandon.

Abandonment may therefore be effected, sometimes by a mere formal legal instrument, sometimes by a course of conduct. It is a matter of intention, to be ascertained by what the parent says and does, viewed in the light of the particular circumstances of the case: *Hazuka's Case*, 345 Pa. 432, 435, 29 A. 2d 88, 89."

See also *Hunter Adoption Case*, 421 Pa. 287, 218 A.2d 764 (1966). The "settled purpose" requirement of § 311(1) has likewise been

parent who had in fact deserted a child could not be said to have abandoned the child.

■ Section 311(1) casts the conjunctive elements of the former abandonment definition in the disjunctive, thereby authorizing termination of parental rights on the basis of *either* ground. *In re Adoption of M. T. T.,* 467 Pa. 88, 354 A.2d 564, 567 (1976); *In re Adoption of Orwick,* 464 Pa. 549, 347 A.2d 677, 679 n. 4 (1975); *In re Cassen,* 457 Pa. 525, 326 A.2d 377, 379 (1974). By isolating "[failure] to perform parental duties" as an independent basis for termination, the legislature has recognized that the absence of a positive intent to sever parental ties does little to mitigate the harm done to a deserted child who is deprived of love, affection and support. Thus a parent's desire to retain parental ties is no longer a defense to a termination petition. See, *In re Lutheran Children & Family Service,* 456 Pa. 429, 321 A.2d 618, 621 (1974).

The change wrought by § 311(1) was to broaden the power of the courts to terminate involuntarily the parental rights of a parent who had relinquished custody and thereafter neglected the child. The subsection did not, however, authorize termination in those instances where the parental neglect occurred at a time when the parent still retained custody. Rather this contingency was expressly provided for in § 311(2). A comparison of the elements of the two subsections persuades us that the legislature did not intend the two to be used interchangeably.

As discussed earlier, § 311(2) provides that termination may not be ordered unless the causes of the incapacity or neglect will not or cannot be remedied. To repeat,

construed as requiring a showing of an affirmative indication of a positive intent to sever parental relations. See, *e. g., In re Adoption of M. T. T.,* 467 Pa. 88, 97, 354 A.2d 564, 568 (1976); *In re Adoption of McAhern,* 460 Pa. 63, 331 A.2d 419, 423 (1975); *In re Adoption of Wolfe,* 454 Pa. 550, 312 A.2d 793, 796 (1973).

the legislature has concluded that if a parent is currently capable of responsibly raising a child, prior instances of abuse or neglect may not support a termination order under § 311(2). Section 311(1), however, contains no such proviso. Once it has been established that a parent has failed to render parental support to a deserted child for the requisite six months period, that parent's rights may be terminated without inquiry into his or her current capacity to care for the child.[6] To read "refused or failed to perform parental duties" as encompassing instances of parental neglect of a child still in the custody of the parent, would be to allow a proponent of the termination to circumvent the "present parental capacity" proviso of § 311(2) merely by filing the termination petition under § 311(1). We cannot ascribe such a purpose to this statutory language. Statutory Construction Act of 1972, 1 Pa. S. § 1922. Thus we hold that § 311(1) does not authorize involuntary termination where, as here, the petition seeking termination is founded on conduct showing parental neglect and incapacity which occurred during a period when the parent had custody of the child.[7]

(2) Appellants' second evidentiary ground relates to events which occurred after Lucille Daoust surrendered

6. We intend to intimate no view as to whether reacquisition of custody of a child by a natural parent prior to the institution of any custody proceeding in effect cancels or cures a prior abandonment. See, e. g., In re Adoption of Battle, 456 Pa. 553, 321 A.2d 622, 624 (1974).

7. Significantly, this Court's previously reported decisions dealing with petitions initiated under § 311(1) have all involved circumstances in which the parent did not have custody of the child for the six month period relied upon in the petition. See, e. g., In re Adoption of M. T. T., 467 Pa. 88, 354 A.2d 564 (1976); In re Adoption of Orwick, 464 Pa. 549, 347 A.2d 677 (1975); In re Adoption of Farabelli, 460 Pa. 423, 333 A.2d 846 (1975); In re Adoption of McCray, 460 Pa. 210, 331 A.2d 652 (1975); In re Adoption of McAhern, 460 Pa. 63, 331 A.2d 419 (1975); In re Cassen, 457 Pa. 525, 326 A.2d 377 (1974); In re Adoption of Battle, 456 Pa. 553, 321 A.2d 622 (1974); In re Adoption of Wolfe, 454 Pa. 550, 312 A.2d 793 (1973); In re Adoption of Sarver, 444 Pa. 507, 281 A.2d 890 (1971).

custody of her daughter to them. It thus may be properly entertained under § 311(1). In June of 1974, following a three month period of unemployment, Lucille secured employment as a kitchen worker at an Army base near her home in Maryland. Under the terms of her employment she was required to be "on call" and was never certain when she would be summoned to work. As a consequence, she was unable to make appropriate child care arrangements and was required to leave the child with one Mrs. Braddock, a sister of Lottie Denson, until such time as she could be assigned a regular work shift. Shortly after Mrs. Braddock had been given temporary custody of Latasha, she told her sister, Lottie Denson, that she was caring for a child whom the mother wished to give away, and inquired whether the Densons might be willing to take custody of the child. On June 24, 1974, appellants traveled to Miss Daoust's home in Maryland and were informed by her that she no longer wanted to keep the baby. In the presence of a lawyer, Miss Daoust and the Densons executed a guardianship agreement giving the Densons custody of the child, but reserving to Lucille reasonable visitation rights and the right to revoke the agreement. The agreement by its terms was expressly "precedent to adoption proceedings." On August 8, 1974, Miss Daoust, through her attorney, wrote to the Densons requesting that they return Latasha to her and advising them that she no longer was willing to consent to the adoption of her daughter.[8] Miss Daoust twice traveled to the Denson home in an effort to effect the return of Latasha to her. The last visit was on June 26, 1975, one day after the instant petition was

8. On July 24, 1974, the Densons had been given custody of Latasha by an order of the Circuit Court of Anne Arundel County, Maryland. This custody order was rescinded on April 15, 1975 at the request of Miss Daoust's social worker, who, at that time hoped that custody could be restored to Miss Daoust. This later order, however, was never enforced in Pennsylvania.

filed. The Densons, however, retained custody of the child.

The Densons contend that both by the act of relinquishing custody of Latasha to them and by her conduct following the relinquishment of custody, Lucille demonstrated the requisite refusal to perform parental duties for a period of six months. We do not agree.

In construing the meaning of the term "parental duties" this Court has noted that a parent has "an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652, 655 (1975). See also *In re Adoption of McAhern*, 460 Pa. 63, 331 A.2d 419, 423 (1975). Section 311(1) does not, however, require that a parent *personally* take care of a child. "The responsibility of performing parental duties may be met if the parent has made reasonable arrangements for the temporary care of the child." *In re Adoption of Wolfe*, 454 Pa. 550, 557, 312 A.2d 793, 797 (1973); *In re Adoption of M. T. T.,* supra. The test is whether a parent has utilized those resources at his or her command in overcoming obstacles which temporarily preclude personal supervision of the child's welfare. *Compare In re Adoption of M. T. T.,* supra, with *In re Adoption of McCray,* supra. See also *In re Kapcsos*, 468 Pa. 50, 360 A.2d 174 (1976).

*In re Adoption of Wolfe,* supra, a mother signed a petition for the voluntary termination of her parental rights eighteen days after the birth of her son. On the same day, custody of the child was delivered to prospective adoptive parents. More than six months later the natural mother revoked her consent to a pending adoption at a hearing on her petition to voluntarily terminate her parental rights. The prospective adoptive parents then initiated a petition for involuntary termination under § 311(1) charging, *inter alia,* that the relin-

quishment of custody of the child for a period of six months constituted a refusal and failure to perform parental duties. In affirming the decision of the trial court which denied the petition, we held that a parent who makes suitable arrangements for the care of a child for a temporary period during a time of personal crisis does not by such an act alone fail or refuse to perform parental duties within the meaning of § 311(1). In the instant case, Miss Daoust through her revocable guardianship agreement made a similar arrangement for the temporary care of Latasha, and like the natural mother in *Wolfe,* she did not refuse to perform parental duties simply by temporarily relinquishing custody of her daughter to appellants for a period in excess of six months.

Nor can we say that the hearing judge erred in concluding that Lucille adequately performed her affirmative parental duties during the period Latasha was in the custody of the Densons. The hearing judge expressly found that Lucille Daoust frequently telephoned the Densons to inquire into the well-being of her child; that she purchased gifts for the child on Christmas and her birthday; and that she twice traveled the considerable distance to the Denson's home in Mercer County in an effort to convince them to surrender custody of Latasha. We are satisfied that these findings are supported by competent evidence in the record and that, given these findings, the court correctly ruled that appellants did not meet their burden of showing that Miss Daoust had failed to perform parental duties.

Decree affirmed. Parties to bear own costs.

EAGEN, ROBERTS, NIX and MANDERINO, JJ., concur in the result.