393 A.2d 410

# In re Involuntary Termination of Parental Rights to W. M., III.

## Appeal of W. and P. M.

Supreme Court of Pennsylvania.

Argued Jan. 14, 1977.

Decided Oct. 5, 1978.

Reargument Denied Nov. 9, 1978.

Central Pa. Legal Services, James D. Wolman, Alan Linder, Lancaster, for appellant.

Alspach & Ryder, Bruce P. Ryder, Lancaster, for appellee, Bureau of Children's Services, Etc.

Before EAGEN, O'BRIEN, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

This is an appeal from a decree of the court of common pleas, orphans' court division, of Lancaster County terminating the parental rights of the appellants, W.M. and P.M. (hereinafter the "parents"), with respect to their son, W.M., III (hereinafter "W").[1] Appellants allege that the evidence

---

1. Jurisdiction of this appeal is in this Court by virtue of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, Art. II, § 202(3), 17 P.S. § 211.202(3) (Supp. 1978), since superseded by Sec. 722(3) of the Judicial Code, 42 Pa. C.S., effective June 28, 1978.

was insufficient to support the termination decree. We disagree, and will affirm.

The parents were married in 1954 and have had six children, of whom W., born October 30, 1963, is the youngest. The family has been known to the Bureau of Children's Service of Lancaster County (herein "Bureau" or "Agency"), appellee herein, since 1956, the agency having been involved with the placement of older children. Over a four-year period subsequent to W's birth numerous visits were made to the home by caseworkers on the staff of the Bureau. Reports of these visits contained in the Bureau's files indicate that the M's house was generally dark, filthy and without heat in cold weather except for an inadequate oil burner. A "terrible" odor permeated the living quarters and the children were unkempt and frequently in need of a change of diapers or clothing. Upon a number of occasions the parents were warned by the caseworkers of the need to upgrade conditions in the home. These warnings went unheeded, however, and the situation in the house remained unchanged. As a result, W. was placed in a foster home in August of 1967, and custody was formally awarded to the Bureau following a court hearing on October 31, 1967.

Over the next four years there was no contact between the parents and the Bureau. The parents made no effort to see W., made no inquiry as to his health or well-being, and sent him no gifts or cards. At the Bureau's initiative a meeting was held with the parents in October of 1971. The condition of the parents' home was discussed, but neither parent expressed any interest in seeing the child. There was no further contact until June of 1973, when the Bureau made two visits to appellants' home concerning one of the other children. Again the home was found to be dirty, dark and foul smelling. On neither of these occasions did the parents mention or inquire as to W. In March of 1975, after the lapse of another sixteen months, a caseworker informed the parents that involuntary termination proceedings were

to be pursued by the Agency.[2] There have been no subsequent encounters between the appellants and the Bureau.

Section 311(1) of the Adoption Act of July 24, 1970, P.L. 620, Art. III, 1 P.S. § 311(1) provides for termination of parental rights where:

> "(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties;"

After a hearing on the termination petition in the case at bar, the orphans' court division made explicit findings that since August 4, 1967, there had persisted both a settled purpose and a refusal and failure on the part of each parent to perform parental duties toward W. It therefore ordered that the parental rights of appellants be terminated.

 A decree of termination based upon Section 311(1) of the Act, *supra,* will be upheld where the evidence shows the parents failed to perform parental duties for a period of six months; that failure established, no "settled purpose" to relinquish parental claim need be proved. *In re Burns,* 474 Pa. 615, 379 A.2d 535 (1977); *Adoption of Croissette,* 468 Pa. 417, 364 A.2d 263 (1976); *In re Howard,* 468 Pa. 71, 360 A.2d 184 (1976); *In re Adoption of M.T.T.,* 467 Pa. 88, 354 A.2d 564 (1970); *In re Adoption of Orwick,* 464 Pa. 549, 347 A.2d 677 (1975); *In re Cassen,* 457 Pa. 525, 326 A.2d 377 (1974). As we stated in *In re Howard, supra* :

> "By isolating '[failure] to perform parental duties' as an independent basis for termination, the legislature has recognized that the absence of a positive intent to sever parental ties does little to mitigate the harm done to a deserted child who is deprived of love, affection and support. Thus a parent's desire to retain parental ties is no longer a defense to a termination petition." 468 Pa. at 80, 360 A.2d at 188–89.

2. From the caseworker's report of this visit, it was testified that heat was still lacking in the home and that the offensive odor remained. The report also reveals the presence of a telephone in the residence, but no telephone inquiry was made by the parents to the Bureau concerning W.

Thus there is an obligation on parents, if they would retain unimpaired their status and rights as such, to "love, protect and support [their] child and to make an effort to maintain communication and association with that child." *In re Adoption of McCray,* 460 Pa. 210, 331 A.2d 652, 655 (1975). The unhappy evidence in this case indicates a complete failure to perform any parental duties whatever for a period of over seven years. We have no difficulty in holding that this failure was sufficient to warrant the decree of the lower court, whether or not the parents also entertained a settled purpose to relinquish any claim to their child.[3]

As justification for the failure to perform parental duties over this protracted period, the parents point to their relatively low mental capacity and charge that the Bureau should have instructed them as to what was necessary to regain custody of the child and should have assisted them to rectify the deleterious conditions in the home. This argument overlooks our case law on the subject, which has made it abundantly clear that the performance of parental duties is an obligation resting affirmatively upon the parents. See *In re William L.,* 477 Pa. 322, 383 A.2d 1228 (1978); *In re Burns, supra; In re Howard, supra; In re Adoption of Orwick,* 464 Pa. 549, 347 A.2d 677 (1975); *In re Adoption of McCray, supra; In re Smith's Adoption,* 412 Pa. 501, 194 A.2d 919 (1963). While it may be that a child care agency should offer education, training and encouragement to parents who evince an interest in keeping a family together by improving conditions in a home, we know of no legal obligation to that effect, and it is not reasonable to suggest that an agency must attempt to generate parental love and concern where there is a total absence of any manifestation

3. The orphans' court made a further alternative finding that the parents suffered from a continuing incapacity to remedy their inability to provide W. with a suitable home life and that termination was proper under the "continued incapacity" test of Section 311(2) of the Adoption Act, *supra.* While this is probably a permissible inference from the evidence, see *Appeal of Diane B.,* 456 Pa. 429, 321 A.2d 618 (1974), we need not consider sub-section (2) of Section 311 of the Act since we find ample support for the termination decree under the second clause of Section 311(1).

of those sentiments. It is lamentably clear in this case that the parents have made no effort to utilize any resources available to them to keep the family intact and so preserve the parental relationship to their child.[4] Cf., *Adoption of Croissette, supra; In re Adoption of M.T.T., supra; In re Adoption of McCray, supra.*

Decree affirmed. Each party to bear own costs.

MANDERINO, J., filed a dissenting opinion in which NIX, J., joins.

JONES, Former C. J., and ROBERTS, J., did not participate in the consideration or decision of this case.

MANDERINO, Justice, dissenting.

I must dissent. The Court finds both a "settled purpose" of relinquishing parental claim and a refusal and failure on the part of each parent to perform parental duties and therefore under Section 311(1) of the Adoption Act of July 24, 1970, P.L. 620, Act III, 1 P.S. § 311(1) terminates the appellants' parental rights. In arriving at this decision the majority has failed to follow our recent decisions which say we must examine the surrounding circumstances. *In re Adoption of Orwick,* 464 Pa. 549, 347 A.2d 677 (1975); *In re Adoption of McAhren,* 460 Pa. 63, 331 A.2d 419 (1975); *In re Adoption of Farabelli,* 460 Pa. 423, 333 A.2d 846 (1975). In *Orwick* we stated:

4. Contrary to the assertion of the dissenting opinion, the Bureau of Children's Service never decided that the parents were capable of providing for their retarded daughter. Rather, after the Bureau had been awarded legal custody of the daughter, it entrusted the active care and custody of the child to the Mental Health and Mental Retardation office of the Department of Public Welfare. That office succeeded in temporarily placing the daughter but eventually was obliged to return the child to her parents (although the caseworker did not consider this desirable) because, in view of the daughter's retarded condition, no other placement facility was available.

Moreover, the dissenting opinion states that the mother contacted the Bureau one month following the removal of W. This, however, is contradicted by the custodian of the records of the Bureau, who testified that no such contact is indicated by the Bureau's files, and that the files would reveal such a contact had it been made.

"Where, as in the instant case, the evidence clearly establishes that the parent has failed to perform his affirmative parental duties for a period in excess of six months, this Court *must then examine the individual circumstances* and any explanation offered by the parent to determine if that evidence, *in light of the totality of circumstances,* clearly warrants permitting involuntary termination . . . . 347 A.2d at 680."
(emphasis added)

In examining the circumstances of the case before us, appellant P.M., the child's mother, has an I.Q. of 47; appellant W.M., the child's father, has an I.Q. of 65. The Bureau of Children's Service was aware of this at the time the child was first removed from appellants' home. It is true that as the majority states appellants did not maintain communication with their son. However, a month or two after the child's initial removal, the mother called the Bureau and requested a visit with her child. She was refused and was told that such a visitation would "upset" the child. Appellants *then* made no further efforts because they believed that to do so would "upset" their son. Appellants were not contacted by the Bureau until four years later and were never advised by the Bureau how to maintain contact with their son.

Furthermore, appellants were lulled into a state of inactivity by the Bureau. When W.M, III, was removed in 1967, the Bureau also removed his sisters from appellants' home. However, in 1974, the Bureau returned to the parents the custody of their mentally retarded daughter even though communications were not maintained with that child.

The majority casually dismisses the facts saying "[w]hile it may be that a child care agency should offer education, training and encouragement, to parents who evince an interest in keeping a family together by improving conditions in a home, we know of no legal obligation to that effect . . . ." At p. 412. While the majority may be reluctant to find a legal duty on behalf of the Bureau, the majority has no such qualms in ignoring these same facts and finding a waiver by appellants of their rights as parents.

The Court does not discuss the appellants' "incapacity" under Section 311(2) but says that such "incapacity" is probably a "permissible inference." At p. 412, n. 4. Given the intellectual capacity of appellants and the fact that the Bureau has not shown that the causes of an "incapacity" cannot or will not be remedied, the parental rights of appellants cannot be terminated under § 311(2). *In re Geiger,* 459 Pa. 636, 331 A.2d 172 (1975). Additionally, the state cannot constitutionally terminate parental rights if the parent is "incapacitated" without fault. *In re William L.,* 477 Pa. 322, 383 A.2d 1228, 1252 (Concurring and dissenting opinion of Nix, J.; and dissenting opinion of Manderino, J.)

It is also important to note that the Bureau returned the retarded child to the appellants but in the case of the son they believed appellants could not perform their parental duties! Surely if the parents are "incapacitated" for one child they would be for the other.

NIX, J., joins in this dissent.