## In re Folcarelli

*Paul S. Foreman*, for natural mother.
*Hiram A. Carpenter, III*, for petitioners.
*Jolene M. Grubb*, for youth services.
*Susan P. Rea*, guardian ad litem for minor child.

PEOPLES, *P.J.*, January 13, 1981—On February 4, 1980, petitioners, Ralph Warren McKendree and Patricia Ilene McKendree, filed with this court their petition for involuntary termination of the parental rights of Patricia Shaffer (now McMasters) and Mark Folcarelli as to their child, Jason A. Folcarelli. Petitioners have had the child in their care and custody since on or about December 22, 1977 (with the exception of a three month period, December, 1978, to February, 1979) when he was placed with them as foster parents by Blair County Children and Youth Service. The court records also reveal that on February 4, 1980, petitioners filed a notice of their intention to adopt Jason.

The instant petition met with immediate opposition from the child's natural mother and, thus, the controversy was scheduled for hearing by this court on February 20, 1980. Because extensive testimony needed to be taken and the court schedule for February 20 would not permit sufficient time, the matter was rescheduled for March 14, 1980. Seeing a need that the interests of the child be fully protected, this court on February 29, 1980, appointed a member of the Blair County Bar, Susan P. Rea, Esq., as guardian ad litem for Jason Folcarelli and since that date, Attorney Rea has actively participated in every phase of the matter. Throughout the course of these proceedings to the present, petitioners have continuously retained the child in their custody pursuant to their foster parent agreement with Blair County Children and Youth Services.

As scheduled, testimony was heard by this court during the entire day of March 14, 1980, and because all of the testimony was not completed at that time, a further hearing occurred on July 24, 1980, at which time the record of testimony was

completed and closed. Participating in both hearings in addition to petitioners and their legal counsel were the mother of the child and her attorney, as well as the child's guardian ad litem and representatives of Blair County Children and Youth Service and that agency's legal counsel. Counsel for petitioners and counsel for the natural mother have both filed briefs with the court and the matter is now ready for decision.

The pertinent segment of this Commonwealth's laws, the Adoption Act, relating to the subject of this case provides as follows:

"The rights of a parent in regard to a child may be terminated after a petition filed . . . and a hearing held . . . on the ground that: (1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties. . . ." July 24, 1970, P.L. 620, art. III, sec. 311, 1 P.S. §311.

By the pleadings in their petition and the legal arguments presented by their counsel, petitioners contend that a decree of involuntary termination of parental rights should be entered both on the ground of "settled purpose of relinquishing parental claim" and on the ground of "failure to perform parental duties." It is clear that in all such cases the burden of proof rests upon the persons seeking to terminate the parental rights: In re Adoption of McCray, 460 Pa. 210, 331 A. 2d 652 (1975).

Tangentially, it is noted that evidence as to the best interests and welfare of the child or the fitness of the parent have no bearing upon the issue of abandonment: In re Adoption of R.I., 468 Pa. 287, 361 A. 2d 294 (1976).

By its decision in In re Howard, 468 Pa. 71, 360 A. 2d 184 (1976), the Pennsylvania Supreme Court has found that section 311(2) of the Adoption Act, supra, is applicable only for periods during which the parent had actual custody of the child. Thus, petitioners' contentions regarding alleged failures of performance of parental duties sounding in the language of section 311(2), supra, have no application in this case. Thus, the determination to be made here is whether one or both of the child's parents by conduct continuing for a period of at least six months either have evidenced a settled purpose of relinquishing parental claim to the child or have refused or failed to perform parental duties.

Abandonment requires a total and permanent relinquishment by the parent: Petition of Diffenderfer, 39 Northumb. 173 (1969). There must be proof of a deliberate decision to terminate the parental relationship absolutely in which the parent persists for at least six months: In re Adoption of Farabelli, 460 Pa. 423, 333 A. 2d 846 (1975).

The "settled purpose" of relinquishing a parental claim implies a finality and permanence of purpose evidenced by affirmative indication of positive intent: In re Adoption of Wolfe Case, 454 Pa. 550, 312 A. 2d 793 (1973). Temporary failure or inability to perform parental duties due to a parent's personal crisis will preclude a finding of abandonment: In re Kapcsos, 468 Pa. 50, 360 A. 2d 174 (1976), the requirement of a "failure or refusal to perform parental duties" mandates that the parent's conduct must be viewed in light of existing circumstances. A parent may be excused from the performance of parental duties where his or her efforts to contact the child would have the effect of worsening the child's situation: In re Adoption of Farabelli, supra.

A myriad of decisions by the appellate and trial courts of this Commonwealth categorically establish that only in the clearest of cases will the parental rights of a natural parent be terminated. Those rights have traditionally been jealously guarded and protected by the courts. Few, if any, other types of judicial action are regarded as so serious and demanding of caution as a decree terminating the rights of a parent to his or her child.

The testimony establishes that the child initially came under the temporary custody of Blair County Children and Youth Service at the request of his mother following her divorce from his father. On January 19, 1978, the mother visited her son at the home of petitioners and thereafter at the request of petitioners to the agency, she was required to conduct visits at the agency's offices. Such an office visit did occur on February 7, 1978. Not until August 29, 1978, did the next such visit take place and thereafter no visits took place until January 10, 1980. On several occasions in 1978 the mother spoke with a caseworker from the agency regarding possible reunification with her child. In November, 1978, the mother moved to Ohio and in December of that year she wrote to the caseworker inquiring of the child's welfare and requesting a Christmas visit with him.

On January 25, 1979, and February 14, 1979, the mother was in telephone contact with the caseworker at the agency and had discussion regarding the possibility of regaining the custody of the child. A home visit between the caseworker and the mother occurred on June 7, 1979, during which her various health problems and work schedule were discussed and understanding was reached to the effect that the mother would notify the agency

of times when she would be able to visit the child in keeping with her work schedule. A letter was received at the agency on July 26, 1979, wherein the mother advised of her move to Ohio and establishment there of a living arrangement with Mr. McMasters. In that letter the mother requested the return of the child to her. That letter was followed by another of similar import received at the agency on August 15, 1979. Through the auspices of the Blair County agency an investigation of the mother's circumstances in Ohio was commenced by an equivalent agency in that state in October, 1979.

On November 23, 1979, the mother visited the Blair County agency office for the purpose of having additional case history information forwarded to the Ohio agency. That visit was followed by a letter from the mother to the Blair County agency which was dated November 28, 1979, and contained a repeat of the mother's wish to be reunited with her son. A further request for visitation was conveyed by Mr. McMasters on behalf of the mother to the Blair County agency by telephone on December 27, 1979. Such a visit did take place on January 10, 1980, at the agency office. Since that date, the mother has visited with the child on February 2, 1980; February 16, 1980; March 1, 15, 29, 1980; April 12, 26, 1980; May 10, 24, 1980; June 7, 21, 22, 1980; and July 4, 5, 6, 19, 20, 1980.

In her testimony, the Blair County Children and Youth Service caseworker unequivocally stated that had this termination proceeding not been instituted by petitioners, the agency would not have done so. She further indicated that the mother had never refused or failed to perform any parental duties which the agency requested of her. By no

means insignificant in this consideration is the fact that the caseworker also indicated that from January, 1978, through June, 1980, the child's father has faithfully paid support at the rate of $100 monthly, a far better record than many which this court reviews in the Domestic Relations section.

The testimony of the mother, Mrs. McMasters, in considerable detail presents a portrait of a young girl, married at age 16, the mother of Jason at age 17, separated from her husband at age 18 and eventually divorced before she was 20. Encountering more personal problems than she could handle led to physical and psychological problems for which she sought medical treatment late in 1977, regretfully at the hands of a medical practitioner in this county who has recently been convicted and sentenced in this court for his abusive and illegal dispensation of dangerous and habit-forming drugs. As she became increasingly dependent upon the drug, quaalude, she became less and less able to care for her child and less and less a responsible person for any purpose. In desperation over her own situation and recognizing that she was not able to cope with raising the child, she contacted the agency and arranged for a temporary placement of the boy.

"No. Before I placed him, Chris Plyler, Miller, then, I told her if he would be placed up for adoption, I wasn't even going to put him in the foster home. She assured me that he would not be placed for adoption."

Nothing in the evidence in this case contradicts the mother's contention that at the date of placement of the child with the agency her clear intent was that it was a temporary arrangment for the best

interests of the child and that she would be reunited with her son as soon as she was better able to provide for him. This court can find no "settled purpose" of relinquishing her parental rights in her actions in December, 1977.

Both the testimony of the agency caseworker and that of Mrs. McMasters indicate that visits with the child and even discussions about the child led the mother to experience emotional "breakdowns." She explained that once she stopped her dependence on quaaludes in early 1979, she began to seriously work toward regaining custody of Jason, but that she also decided that she should avoid visits with him at that time because of the emotional trauma which the visits produced for both her and the boy. Measured strictly by the law that decision was not the best and obviously casts a shadow which has caused her to meet with the difficulty of having to resist the present action against her rights.

We have given close and lengthy study to the testimony rendered by Alfred T. Farrell, a psychiatric social worker, regarding his work with Jason after he had been placed in the agency's custody. Certainly that testimony portrayed the child as one who was suffering serious psychological problems which in Mr. Farrell's opinion stemmed from a "pervasive fear of abandonment." We have no doubt that those problems were at least in part caused by the confusion and turmoil to which the child was subjected by his mother's actions and his eventual placement with the agency. Although the record of his testimony clearly shows Mr. Farrell's opinion that Jason now regards petitioners as his parents and that if he is taken from them, he will have problems, he also has opined that if Jason's relationship with his mother is terminated, he will

likewise have problems. These are not factors for consideration here, however, as we have previously noted: In re Adoption of R.I., supra.

The testimony of petitioners is not contradicted by that of the mother to the effect that during the period of early 1978 through January, 1980, the mother sent no gifts, cards, or letters to the child. Likewise, no such contacts were had with the child by his father nor by any member of either his mother's or his father's families. Petitioners argue that these facts clearly establish an intent to relinquish parental rights, but when viewed along with the history of the mother's contacts with the agency during the same period, we do not find that the evidence of the requisite intent is convincing.

Petitioners further contend that the personal crisis claimed by the mother as the reason for her actions was not of such proportion or severity as to constitute an excuse or explanation for her lack of contact with her child. It is the belief of this court that the severity and extent of a personal crisis must be measured in terms of the person experiencing it. What may be but a "trying" set of circumstances for one person may well be the cause of a total emotional collapse for another. In this case, we are not inclined to accept petitioners' contentions that the mother is exaggerating the severity of her emotional problems to have them serve as an excuse for her wayward behavior regarding her son for a number of months.

Our review of the evidence in this case leads to the observation that there is really no great dispute between petitioners and the mother as to the nature and frequency of her contacts with the child. Rather, this case involves a dispute over the interpretation to be given to the mother's conduct.

Counsel for the mother has offered a motion for

dismissal of the instant petition on the ground that petitioners have failed to bear their burden of proof. In support thereof he has cited the case of In re Adoption of R.W.B., 485 Pa. 168, 401 A. 2d 347 (1979), and both he and counsel for petitioners have dealt with the decision in their briefs. There in vacating the order of a common pleas court which terminated the parental rights of a natural mother the Supreme Court of Pennsylvania has, we believe, clearly established the guidelines by which the instant matter must be decided, at p. 173, 174, 176:

"The involuntary termination by law of a natural parent's right to his or her child is a harsh measure carrying serious consequences for both parent and child which a court should grant only where clearly warranted by a preponderance of the evidence. [Citations omitted.]

"A 'settled purpose' to relinquish parental claims requires a deliberate decision by the parent to terminate the parental relationship, and the parent must persist in that determination throughout the six-month period. [Citations omitted.] . . . Moreover, any action by the parent within the six-month period inconsistent with such 'settled purpose' will preclude an involuntary termination of that parent's rights. [Sarver Adoption Case, 444 Pa. 507, 281 A. 2d 890 (1971).]

". . . Further, this Court has held that evidence of parental inaction, and lack of interest in excess of six months will not conclusively establish a 'settled purpose' to relinquish. [Citations omitted.]

". . . Pennsylvania case law recognizes a parent may fulfill his or her responsibility for parental duties in such a situation by making reasonable

arrangements for the temporary care of a child."
[Citations omitted.]

In the R.W.B. case, supra, we find a mother who in time of personal crisis agreed to give up her child for adoption and actually signed a written consent to the adoption. Thereafter and prior to the completion of the adoption proceeding, she changed her mind and demanded the return of her child; but was refused and eventually suffered the entry of a decree terminating her parental rights at the trial court level.

Measuring the case at bar by the precepts set forth in the R.W.B. case, supra, we conclude that the mother of Jason was, in fact, experiencing a very real personal crisis when she delivered her child into the custody of Blair County Children and Youth Service. Her subsequent involvement with dangerous drugs prescribed for her by a physician only served to deepen and complicate that personal crisis. In turning the child over to the agency, she certainly acted responsibly as a parent and sought thereby to serve his best interests and welfare. In so doing, she made reasonable, temporary provision for all of Jason's needs at a time when she was obviously unable to provide for them herself. We do not conclude that she failed or refused to perform her parental duties. At the same time, she clearly indicated that she had no intention of relinquishing her rights to the child and actually sought and obtained assurance from the agency that the child would not be placed for adoption. In the months that followed she never notified the agency or anyone else that she desired to give up her rights as the child's mother or that she wanted him to be adopted.

Sporadic though they may have been for some time, the mother did make contacts with the agency even though she had elected to not visit with Jason. None of those contacts (nor the sparcity of them) serves to convince this court that she evidenced a "settled purpose" to relinquish her rights to her child. In fact, such actions by the mother are viewed as evidence exactly to the contrary.

Following the mandate of the Supreme Court and keeping in mind the harsh and irreversible nature of the relief sought by petitioners, we can only conclude from the totality of the record in this matter that such relief is not "clearly warranted by a preponderence of the evidence."

The natural father of the child, although properly notified of all of the proceedings in this matter, has taken no active part in them. He appeared at the first hearing, but said nothing. He made no appearance at the second hearing. He has offered no evidence; filed no pleadings; and in effect, raised no contest to the instant petition. Nonetheless, as noted previously, he has faithfully and regularly contributed to the child's support and apparently continues to do so even to the present. Certainly, this court recognizes that effort by the father as a fulfillment of at least a part of his parental obligations. That effort, however, would not alone satisfy this court that his parental rights should not be terminated.

The reluctance in this court's mind to terminate the father's parental rights may best be described as founded upon public policy. By virtue of our earlier comments, we are not terminating the rights of the mother. Thus, an adoption of Jason at this time is neither possible nor anticipated. A termination of his father's rights likewise terminates his obliga-

tions to the child including the obligation of providing support. The termination of that obligation for support would leave Jason as a prime candidate to become a public charge since as the record now appears, we must conclude that he will continue in foster care with the county agency for at least some period into the future Accordingly, we will not sever Jason from his present means of financial support, namely, his father, and thereby cause him to become a burden upon the taxpayers.

For all of the foregoing reasons, we believe the following order appropriate.

### ORDER

Now, January 13, 1981, the petition for termination of the parental rights of Patricia Shaffer, now Patricia McMasters, and Mark Folcarelli as to their child, Jason Folcarelli, is denied and dismissed.