J-S71031-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: B.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.L.R. | No. 979 MDA 2014 |

Appeal from the Decree dated May 6, 2014,
in the Court of Common Pleas of Susquehanna County,
Orphans' Court, at No(s): 2013-102 OC

BEFORE:   FORD ELLIOTT, PANELLA, and FITZGERALD*, JJ.

MEMORANDUM BY FITZGERALD, J.:               **FILED DECEMBER 03, 2014**

L.L.R. (Mother) appeals from the decree of the Susquehanna County Court of Common Pleas, which involuntarily terminated her parental rights to her child, B.B. (Child), born in March of 2012.[1]  We affirm.

The relevant facts and procedural history of this case are as follows. Child first came to the attention of Susquehanna County Services for Children and Youth (the Agency) in December of 2012, when Mother overdosed on Xanax and was hospitalized.  N.T., 2/10/14, at 4.  Mother and Father had "housing issues" at the time, and thus a safety plan was developed under which Child would reside in the home of Father's cousin, C.D.[2]  *Id.*  However, the Agency received a report that C.D. had been

---

* Former Justice specially assigned to Superior Court.

[1] The Child's father's ("Father's") parental rights were terminated by a decree dated February 14, 2014.  Father is not a party to the instant appeal.

[2] In the transcript of the second day of testimony, C.D.'s first name is spelled differently, resulting in the initials S.D.  *See, e.g.*, N.T., 4/15/14, at 102.

"partying" and using marijuana. *Id.* at 5. C.D. tested positive for marijuana. *Id.* at 6. As a result, Child was placed in foster care on December 18, 2012. *Id.* at 4. Child was adjudicated dependent by order dated December 28, 2012. *Id.* at 9.

Shortly thereafter, Mother and Father moved to Syracuse, New York and returned to Pennsylvania sometime in the spring or summer of 2013. N.T., 2/10/14, at 23; N.T., 4/15/14, at 24. In May of 2013, Mother and Father were arrested in connection with an alleged theft in Maryland. N.T., 2/10/14, at 23; N.T., 4/15/14, at 24. Father was incarcerated for four or five weeks, and Mother was sentenced to probation. N.T., 2/10/14, at 24; N.T., 4/15/14, at 71. Mother lived in Maryland during the time that Father was incarcerated. N.T., 2/10/14, at 24; N.T., 4/15/14, at 71. At the time of the termination proceedings, Mother and Father had returned to Pennsylvania and were residing in the home of Father's aunt, E.P. N.T., 2/10/14, at 24; N.T., 4/15/14, at 35, 70.

On December 10, 2013, the Agency filed petitions to terminate the parental rights of Mother and Father. A termination hearing was held on February 10, 2014, at which the orphans' court heard the testimony of Agency caseworker Katelyn Briggs, Child's foster father M.B. (Foster Father), and Father. During Ms. Briggs' testimony, Mother's counsel indicated that Mother had asked to talk to him and Father. N.T., 2/10/14, at 32. The orphans' court granted a brief recess. *Id.* Mother's counsel announced that Mother had decided to voluntarily terminate her parental rights to Child. *Id.*

at 32-33. Ms. Briggs then testified that she witnessed Mother sign a consent to adoption form. *Id.* at 34.

By decree dated February 14, 2014, the orphans' court involuntarily terminated Father's parental rights to Child. On February 20, 2014, the Agency filed a petition to confirm Mother's consent to adoption. A hearing on this petition was scheduled for March 26, 2014. On March 12, 2014, however, Mother filed a revocation of her consent. The orphans' court continued the prior termination hearing, and testimony resumed on April 15, 2014. The court heard the testimony of Ms. Briggs, Foster Father, and Mother. By decree dated May 6, 2014, the orphans' court involuntarily terminated Mother's parental rights.

This appeal followed.[3] Mother did not file a contemporaneous statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On July 7, 2014, this Court issued an order *per curiam*, directing that Mother file a concise statement, and Mother timely complied.[4]

---

[3] We consider whether the notice of appeal was timely filed. Instantly, the notice of appeal was filed on June 6, 2014, thirty-one days after the date of the decree. *See* Pa.R.A.P. 903(a). However, the date of the entry of the order is the day the clerk of courts makes the notation on the docket that notice of entry of the order was given pursuant to Pa.R.C.P. 236(b). *See* Pa.R.C.P. 236(b). The docket does not include a notation that Rule 236 notice was sent; therefore, the appeal is not untimely. *See In re L.M.*, 923 A.2d 505, 508-09 (Pa. Super. 2007) (appeal not untimely where no indication on docket Rule 236(b) notice sent).

[4] Although Mother initially failed to file a concise statement, we decline to dismiss or quash her appeal. *See In Re K.T.E.L*, 983 A.2d 745, 747 (Pa.

Before addressing the merits of Mother's appeal, we note that her brief fails to comply with our Rules of Appellate Procedure. Specifically, Mother's brief does not include a Statement of Questions Involved, as required by Pa.R.A.P. 2111(a)(4) and Pa.R.A.P. 2116(a). This could result in the waiver of Mother's claims. *See Wirth v. Commonwealth*, 95 A.3d 822, 858 (Pa. 2014) (quoting *Commonwealth v. Miller*, 424 A.2d 531, 533 (Pa. Super. 1981)) ("This rule is to be considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby."). Here, however, Mother filed a concise statement raising issues that she wished to address on appeal and her arguments with respect to these issues are readily discernible in her brief.[5] Because Mother's procedural error does not impair our ability to review her claims or cause any prejudice, we decline

---

Super. 2009) (holding that failure to file concise statement of errors complained of on appeal **with** the notice of appeal pursuant to Pa.R.A.P. 1925(a)(2)(ii) will result in a defective notice of appeal, to be disposed of on a case by case basis). This misstep was not prejudicial to any of the parties and did not impede the orphans' court's ability to issue an opinion.

[5] Mother raised the following issues in her concise statement of errors complained of on appeal:

> 1. The [orphans' c]ourt abused its discretion by ruling the [Agency] met its burden of proof by clear and convincing evidence.

> 2. The [orphans' c]ourt abused its discretion by not considering [Mother's] post-notice remedial measures.

Mother's Statement of Errors Complained of on Appeal, 7/15/14.

- 4 -

to find waiver. *See Green v. Green*, 69 A.3d 282, 285 n.2 (Pa. Super. 2013) (quoting *White v. Owens–Corning Fiberglas, Corp.,* 668 A.2d 136, 141 (Pa. Super. 1995)).

We note the relevant standard of review.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act,[6] which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the

---

[6] 23 Pa.C.S. §§ 2101-2938.

emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d at 511 (citations omitted).

In the case at bar, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), and (5), and (b). "[W]e need only agree with [the orphans' court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we consider whether the orphans' court properly terminated Mother's parental rights pursuant to Section 2511(a)(2).

Section 2511 provides, in pertinent part:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental wellbeing and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing

and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

This Court has stated:

In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In her first issue, Mother avers "suffered abuse as a child and sustained a head injury severely impairing her mental ability." Mother's Brief at 4.[7] Mother indicates that this Court must assess her performance as a parent in light of these circumstances. *Id.* (citing *Matter of M.L.W.*, 452 A.2d 1021 (Pa. Super. 1982); *In Interest of C.M.E.*, 448 A.2d 59 (Pa.

---

[7] We note that Mother references the Agency's dependency petition, which is not contained in the certified record, for this proposition.

Super. 1982)). Mother argues that she "did substantially comply" with her service plan after the petition to terminate her parental rights was filed. *Id.* at 2. Mother states that, at the time of her termination hearing, she was only one class away from completing a parenting program, she was enrolled in drug and alcohol and mental health counseling, and that Father's aunt, with whom she continues to live, "had previously been approved" by the Agency. *Id.* at 6.

Mother also quotes the orphans' court's statement that because she initiated certain remedial efforts after the petition to terminate her parental rights was filed, the court "cannot by law consider these efforts in the determination of whether or not certain grounds have been established by [the A]gency to terminate [her] parental rights," pursuant to Section 2511(b). *Id.* at 6 (quoting Orphans' Ct. Op., 5/8/14, at 5) (unpagniated). Mother contends this was an error of the law, as "§ 2511(b) prohibits evidence of post-notice remedial measures only in cases of § 2511(a)(1) and (6)," and because "§ 2511(b) actually states the Court cannot consider remedial measures FIRST initiated subsequent to Notice of the Petition to Terminate Parental Rights." *Id.* at 6, 9 (emphasis in original). Mother argues that she did not initiate her various remedial efforts after the filing of the petition, but that she "had been struggling to accomplish them since the initial placement," and that the orphans' court abused its discretion by failing to consider them. *Id.* at 6-7.

Finally, Mother observes that Child has been in placement for less than two years, and that her parental rights were terminated roughly one and one-half years after the Child was adjudicated dependent. *Id.* at 7. Mother claims that because of "the obstacles she has had to overcome, there remains [a] reasonable possibility she can remedy the causes for placement." *Id.* at 7. She further argues that her parental rights should not have been terminated because, in light of her improved living conditions, it cannot be said that her parental incapacity could not or would not be remedied. *Id.* at 8 (citing *In re Howard*, 360 A.2d 184 (Pa. 1976)).

It its opinion, the orphans' court indicates that after Child was adjudicated dependent, it "recommended and/or ordered" that Mother complete four parenting objectives. Orphans' Ct. Op. at 2. These objectives were to "(1) obtain and maintain stable housing, (2) follow through with the recommendations of a drug and alcohol evaluation, (3) obtain a mental health evaluation and (4) complete a parenting program." *Id.* At Mother's first termination hearing, Ms. Briggs testified there had been four review hearings since Child was adjudicated dependent. N.T., 2/10/14, at 7. At each of these review hearings, Mother's compliance and progress were characterized as minimal. *Id.* at 7, 12, 15, 20; N.T., 4/15/14, at 7.

Concerning Mother's housing objective, Ms. Briggs testified as follows. Mother and Father have frequently changed residences. N.T., 2/10/14, at 21-24; N.T., 4/15/14, at 10-11. Moreover, Mother and Father were

uncooperative in informing the Agency of where they were staying. When Mother and Father returned to Pennsylvania from Syracuse, they initially refused to give Ms. Briggs their address. N.T., 2/10/14, at 23, 27-28; N.T., 4/15/14, at 11. On December 30, 2013, Ms. Briggs attempted to visit Mother at the home of Father's aunt. N.T., 2/10/14, at 25; N.T., 4/15/14, at 17. Mother was angry that Ms. Briggs was at the home and refused a drug test. N.T., 2/10/14, at 25; N.T., 4/15/14, at 18. Father's aunt asked Ms. Briggs if she could return and review the residence at a later date, but Ms. Briggs did not return and attempt a second visit. N.T., 4/15/14, at 35.

Concerning Mother's drug and alcohol objective, Ms. Briggs testified Mother completed a drug and alcohol evaluation and was recommended for inpatient treatment in October of 2013. N.T., 2/10/14, at 20; N.T., 4/15/14, at 27. However, Mother did not receive inpatient treatment. N.T., 2/10/14, at 20. On January 15, 2014, after the petition to terminate her parental rights was filed, Mother underwent a second drug and alcohol evaluation. N.T., 4/15/14, at 14-15. It was recommended that Mother attend intensive outpatient treatment. *Id.* at 16. Mother attended one appointment on January 27, 2014, but, to Ms. Briggs' knowledge, Mother failed to appear after that. *Id.* Mother was discharged unsuccessfully from the program. *Id.* at 17.

Ms. Briggs also noted Mother had failed a drug test in September of 2013 testing positive for opiates. *Id.* at 43. Mother provided Ms. Briggs

with "a piece of paper that—basically said all the side effects" of certain prescription drugs, but "it didn't give any information as to how—like when is this script good till, how many pills were in the bottle, does she have any refills, anything like that." *Id.* at 41. Ms. Briggs requested a drug test from Mother in October of 2013, but Mother claimed she was unable to provide a sample. *Id.* at 43. Ms. Briggs reiterated that Mother had refused a drug test during her visit to the home of Father's aunt in December of 2013. *Id.* at 44.

Concerning Mother's mental health objective, Ms. Briggs testified that Mother completed a mental health evaluation on January 21, 2014. *Id.* at 15, 30, 33. Ms. Briggs was not aware of any follow up after the initial evaluation. *Id.* With respect to parenting classes, Ms. Briggs testified that, while Mother did take some classes, she failed to complete a parenting course. *Id.* at 38-39, 50-51. Ms. Briggs had not received any information indicating that Mother was continuing to participate in a parenting program. *Id.* at 49.

Ms. Briggs also testified concerning Mother's visitation with Child. Mother and Father initially visited with Child consistently. N.T., 2/10/14, at 13; N.T., 4/15/14, at 46. However, visitation became an issue after the parents were arrested in Maryland. N.T., 2/10/14, at 16. From May of 2013 to October of 2013, Mother was offered twenty-six visits with Child. *Id.* at 25-26; N.T., 4/15/14, at 44. Mother attended only eleven of these visits

and was late to six of the 11. N.T., 2/10/14, at 26; N.T., 4/15/14, at 8, 46, 55. From October 2013 until February 2014, the parents attended most of their visits, although they "might have been late a couple times." N.T., 4/15/14, at 47. Mother was sometimes hostile towards Ms. Briggs during visits and once threatened to punch her in the face. *Id.* at 13. The Agency provided Mother and Father with gas money during the time they were living in Syracuse. *Id.* at 20. The Agency stopped providing gas money when it received information that Mother and Father might no longer be living there. *Id.*

Mother testified to the following. She still resides with Father in the home of Father's aunt. N.T., 4/15/14, at 70. Father's aunt's home was previously approved by the Agency for Father's aunt's granddaughter to live there. *Id.* at 75. On the day Ms. Briggs visited Father's aunt's home, Mother was "sicker than a dog," and the house was a mess because they had been "moving [Father's aunt's] son's stuff out of the basement to upstairs, so he could come and get it." *Id.* at 76. Mother stated this was why Ms. Briggs was denied access to the home. *Id.* at 77.

With respect to drug and alcohol treatment, Mother claimed she was unable to get a drug and alcohol evaluation while living in Syracuse, despite going to a free clinic almost every weekday for "2 months straight." *Id.* at 84-85. After Mother completed an evaluation in Pennsylvania, she failed to attend drug and alcohol appointments on January 22, 2014, and February 4,

2014. *Id.* at 79-80. Mother was sick during the week of the first appointment, and she simply forgot about the second appointment because she was still moving items out of Father's aunt's basement. *Id.* She had a drug and alcohol appointment the day before she testified and another appointment scheduled for the day after. *Id.* at 81. Mother was to complete a six-week treatment program. *Id.* at 82. She claimed that her positive drug test for opiates resulted from her valid prescriptions for Vicodin and Percocet. *Id.* at 83.

Mother testified she had failed to complete a mental evaluation because the evaluator "didn't have enough time," but she was going to get another appointment. *Id.* at 86-87. Mother did not complete parenting classes in Syracuse because "they're not licensed" and because there was a waiting list. *Id.* at 88. Mother attended parenting classes in Pennsylvania. *Id.* She had one more parenting class to complete and the class was scheduled for April 17, 2014. *Id.* at 91.

Mother stated she and Father had made it to every visit with Child they could while living in Syracuse, "except for when the roads and stuff were closed." *Id.* at 93. It was difficult for Mother to visit Child in Pennsylvania "because it's hard to come from Syracuse to Pennsylvania twice a week." *Id.* Mother indicated the Agency stopped providing them with a gas card while they were still living in Syracuse, and that Mother and Father sometimes lacked the money to travel. *Id.* at 93-94. Mother missed

visits between May 2013 and October 2013 because her grandfather was sick and she was staying with her other children. *Id.* at 95. Mother acknowledged that she has three other children, two of whom now resided with her grandmother in Maryland and one of whom lived with her aunt in Delaware. *Id.* at 98-99. Mother voluntarily relinquished custody for all three children. *Id.* Mother also admitted to threatening to punch Ms. Briggs in the face during a visit, but explained that "they were just getting nasty and smiling about everything—about us losing [Child]." *Id.* at 98.

The orphans' court found the testimony adduced at Mother's termination hearing established that Mother "has for a period of more than six (6) months beginning in or about December, 2012, refused or failed to perform parental duties." Orphans' Ct. Op. at 4. The court concluded "she has failed to become compliant with the [A]gency's recommendations and the provisions of the court's orders designed to enable her to re-obtain legal and physical custody [Child]." *Id.* at 4-5. The court explained that "[b]y her abysmal history of attempting to remedy the conditions which led to the dependency of [Child], we conclude that she will not and cannot become an adequate parent for [Child]." *Id.* at 5. The court also noted that Mother had voluntarily relinquished custody of her other three children to her grandmother and her aunt. *Id.*

After careful review, we determine that the record supports the orphans' court's conclusion that the Agency sustained its burden with regard

to Section 2511(a)(2). First, to the extent Mother argues that the orphans' court should have been more lenient due to her alleged mental disability, she cites only the dependency petition, which is not included in the certified record before this Court. We find no documentation of the nature or extent of this disability and Mother did not testify at the termination hearing that she is disabled in a way that limits her ability to complete her parental objectives. *See* N.T., 4/15/2014, at 98, 108.

Furthermore, we need not review Mother's claim that the orphans' court concluded incorrectly that she first initiated remedial efforts after the filing of the termination petition, as the relevant portion of Section 2511(b) applies only to Sections 2511(a)(1), (6), and (8).

The evidence presented at Mother's hearings supports the court's conclusion that her rights should be terminated. By the second day of Mother's termination hearing, nearly a year and four months after Child had been adjudicated dependent, Mother still had failed to complete the majority of her objectives. It was reasonable for the orphans' court to conclude Mother was incapable of parenting Child, that Child had been left without proper parental care and control, and that Mother cannot, or will not remedy her parental incapacity. *See* 23 Pa.C.S. § 2511(a)(2); *In re Adoption of M.E.P.*, 825 A.2d at 1272. We discern no abuse of discretion. *In re T.S.M.*, 71 A.3d at 267.

Next, we consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). Although Mother makes no argument with respect to this section, pursuant to the necessary bifurcated analysis, we review it.

The requisite analysis is as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted).

Our Supreme Court has explained, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, 71 A.3d at 267. "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268. Moreover, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years,

- 16 -

and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.* at 269.

Here, the orphans' court found that terminating Mother's parental rights would be in Child's best interest. Orphans' Ct. Op. at 5. The court reasoned "there was little bond between Mother and [Child] in that [Child] was about nine (9) months old at the time of her coming into placement with the [A]gency." *Id.* The court also noted that Child is bonded with her foster family and "is flourishing under their daily care." *Id.* The court concluded that termination would not adversely affect Child. *Id.*

We conclude the record supports the orphans' court's findings. Ms. Briggs testified that Mother does not have a "mother-daughter bond" with Child. N.T., 2/10/14, at 29; 4/15/14, at 5. Child is comfortable with Mother, but "the bond between [Child] and [Mother] is the same as between [*sic*] the bond between myself and [Child]." N.T., 4/15/14, at 5. In contrast, Child calls her foster parents "mom and dad." *Id.* Child was "doing very well" in the foster parents' care and she was "very much a part of their family." *Id.* at 6. Child "has made significant bonds with . . . her pre-adoptive foster parents." N.T., 2-10-14, at 40. Child "has a very strong bond" with foster parents' biological daughter, E. N.T., 4/15/14, at 6. Ms. Briggs opined that that terminating Mother's parental rights would not impact Child. *Id.*

Child's Foster Father testified Child was "developing . . . as a typical 2-year old" and was "full of life, happy, energetic, overall just—doing great." *Id.* at 65. Child and his daughter, E., have a "really tight relationship" and play together "like natural siblings." *Id.* at 66. Foster Father loves Child and is willing to adopt her. N.T., 2/10/14, at 50-51; N.T., 2/15/14, at 66. He stated his wife, K.B. shared his sentiments. N.T., 2/10/14, at 50; N.T., 4/15/14, at 66.

Mother testified she "still had a good bond" with Child when visits first began. N.T., 4/15/14, at 96. Mother's visits with Child were supervised, and Mother stated this made the visits stressful because "I didn't do certain things with my daughter that I would do if—we were by ourselves because they were there. So I didn't let myself get closer to her." *Id.* at 96-97.

The orphans' court opined:

> We determine that there was little bond between Mother and [Child] in that she was about nine (9) months old at the time of her coming into placement with the agency.
>
> We note that the bond between the adopting foster parents, [E.] and [Child] is very tight. . . .
>
> [W]e conclude that the best interest of [Child] would be served by the termination of [Mother's] paternal (sic) rights and her adoption by [foster parents]. Such termination of Mother's parental rights would not adversely affect [Child].

Orphans' Ct. Op. at 5. We agree.

- 18 -

After a careful review of the record, we find there was competent evidence in the record to support the orphans' court termination of Mother's parental rights under Sections 2511(a)(2) and (b). ***See In re T.S.M.***, 71 A.3d at 267.

For all the foregoing reasons, we affirm the orphans' court's decree granting the petition to terminate Mother's parental rights and change the goal to adoption.

Decree affirmed.

Judgment Entered.

JosephD.Seletyn,Esq.
Prothonotary

Date: 12/3/2014